UNION LIQUORS COMPANY *vs.* ALCOHOLIC BEVERAGES CONTROL COMMISSION. February 19, 1981. The Commission (ABCC; see G. L. c. 6, § 43, as amended through St. 1977, c. 872, §§ 7-9) allowed subsidiaries of Joseph E. Seagram & Sons, Inc. (Seagram), a manufacturer, to discontinue certain brand name liquor sales to the plaintiff (Union), a licensed wholesaler of alcoholic beverages. See G. L. c. 138, § 18, as amended through St. 1975, c. 665. Union sought judicial review of ABCC's decision. G. L. c. 30A, § 14, as amended through St. 1976, c. 411, §§ 1 & 2. A judge of the Superior Court, on a stipulation of certain facts and largely documentary evidence, made findings. Judgment was entered affirming the decision of ABCC. Union has appealed.

Union had been a nonexclusive distributor of Seagram's brand name products under contracts with one or more of Seagram's subsidiaries. Each contract had a one-year term and was automatically renewable on a monthly basis until the termination mentioned below. The distribution contracts with Union contained par. 12 which reads: "*Cancellation for Cause.* Either party may cancel this agreement on fifteen (15) days' writ-

ten notice on any of the following grounds: . . . (i) Sale or *transfer of control or management* of the other party" (emphasis supplied). For many years about 83% of Union's capital stock had been owned by one Leen and his family (Leen). On August 18, 1978, C. Pappas, Inc. (Pappas), acquired this stock from Leen. Seagram then (acting through various subsidiaries) notified ABCC, with a copy to Union, on August 23, and August 29, that, because of the change in ownership, Union would cease to be a distributor for Seagram products.

General Laws c. 138, § 25E (as amended through St. 1977, c. 929, § 11), reads in part: "It shall be an unfair trade practice and therefor unlawful for any manufacturer . . . or wholesaler [i.e. supplier] of any alcoholic beverages, to refuse to sell, except *for good cause shown,* any item having a brand name to any licensed wholesaler to whom such . . . [supplier] has made regular sales of such brand item during a period of six months preceding any refusal to sell. Any . . . [supplier] shall forward a notice in writing to the wholesaler, to whom it has sold any brand item, prior to discontinuing sales to such wholesaler of such brand item and shall forward a copy . . . to the commission. The notice of discontinuance of sale shall be furnished . . . to the wholesaler being discontinued at least one hundred and twenty days before the effective date of such discontinuance" and "shall state the specific grounds for such discontinuance. Either party may appeal to the commission for a hearing . . . and the commission shall make a determination after hearing on the issue of good cause for discontinuance. Upon [the wholesaler's] application . . . the commission shall order the . . . [supplier] to continue to make sales in the regular course to such wholesaler pending determination by the commission on the merits of said appeal. The commission shall after notice . . . and hearing, make a determination on the issue of good cause and grant such relief as may be appropriate . . . . Good cause as used herein shall be limited to the following conduct: (*a*) disparagement of the product so as to impair the reputation of the brand owner or the brand name . . ., (*b*) unfair preferment in sales effort for brand items of a competitor, (*c*) failure to exercise best efforts in promoting the sale of any brand item, (*d*) engaging in improper or proscribed trade practices, or (*e*) failure to comply with *the terms of sale agreed upon between supplier and wholesaler.*" (Emphasis supplied.)

1. The ABCC, at the hearing on October 19, 1978, discussed whether the notices of discontinuance of August 23 and 29 were adequate. In any event, new notices dated October 20, 1978, were sent out on behalf of Seagram after the hearing, affording Union a full 120 days' notice of the proposed discontinuance of sales with assurance (as a consequence of an order by ABCC) of continued shipments to Union during the 120 day period. ABCC found, in a decision dated January 10, 1979, that (although "the original notice was technically deficient") any notice deficiency was cured by the letters of October 20, and that no repetition of the October 19 hear-

ing was necessary because there was "no evidence that the substantive issues . . . [had] changed subsequent to the delivery of effective notice."

On January 31, 1979, ABCC denied Union's request for reconsideration which raised essentially all issues now argued. We agree with the trial judge that, in the circumstances, Union has not been prejudiced by any deficiencies in the August notices or by the fact that curative notices were sent after the hearing. To give a new hearing on the only substantive issue ("good cause") indeed would have involved "needless repetition." There has been no showing of any material change of circumstances between the hearing on October 19, 1978, and the decision of the ABCC on January 10, 1979, or before the expiration of 120 days after October 20, 1978, the date of the curative notices. Union also has not shown that it applied, after the expiration of the 120 day notice period, for any new hearing before ABCC.

2. The trial judge correctly sustained ABCC in holding that, under § 25E, Seagram's subsidiaries could cancel their agreements with Union because of Pappas's acquisition of 83% of Union's stock. This acquisition was a "failure to comply with the terms of sale agreed upon between supplier and wholesaler." See clause (e) of the provisions defining "good cause" in § 25E.

Paragraph 12 of the distribution agreements (*supra*), permitting cancellation in the event of transfer of the control or management of the other party seems to us to be an important provision of the "terms of sale." Persons in a highly sensitive, closely scrutinized business (such as the liquor business) have need to know about and appraise the persons behind corporations with whom they are doing business, for reasons which may be wholly unconnected with credit standings, or prompt payment of bills. A provision for cancellation in the event of a change of control of one's distributor or supplier is a reasonable method of ensuring freedom for a supplier to select a new distributor (or a wholesaler to select a new supplier) in the event of such a change of control as occurred here. We have been referred to no statutory provision (in c. 138 or elsewhere in the General Laws) forbidding a provision such as par. 12 of the agreements. Also, nothing in § 25E (or in the legislative history of St. 1971, c. 833, by which the definition of "good cause" was added) suggests that "terms of sale" is confined to matters pertaining to payments and credit. See 1971 House Doc. Nos. 4793, 5617, and 5768 (in which the language here material first appears), and 1971 House Journal, June 8, at 1868. Indeed, clauses (a), (b), (c), and (d), of the definition of "good cause," each refer not to credit matters but to matters of a general nature. Each of these matters (if attributable to the other member of a supplier-wholesaler relationship) would make such other member an uncomfortable person with which to be bound to do business. No such ambiguity exists in clause (e) of the statute as to lead us to depart from the ordinary meaning of tfe words "terms of sale." See *Rosenbloom* v. *Kokofsky*, 373 Mass. 778, 780-781 (1977).

*Judgment affirmed.*

*John M. Doukas* for the plaintiff.
*Thomas Miller,* Assistant Attorney General, for the defendant.