EASTERN OF MAINE, INC.

v.

VINTNERS GROUP LTD. and Pine State Tobacco & Candy Co., d/b/a Pine State Beverage.

DIRIGO DISTRIBUTORS and Colonial Distributors, Inc. and United Distributors of Maine, Inc.

v.

SEABOARD PRODUCTS, INC., d/b/a Vintners Group Ltd.

Supreme Judicial Court of Maine.

Argued May 12, 1982.

Decided Feb. 1, 1983.

Skelton, Taintor & Abbott, P.A., Stephen P. Beale (orally), Lewiston, for Dirigo Distributors.

Brann & Isaacson, Stuart J. Novick (orally), George S. Isaacson, Lewiston, for Eastern of Maine and Robert LaBrie.

Preti, Flaherty & Beliveau, Jonathan S. Piper (orally), Portland, Severin M. Beliveau, Augusta, for Seaboard Products.

Lipman, Parks, Livingston, Lipman & Katz, John M. Parks (orally), Augusta, for Pine State Tobacco.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

CARTER, Justice.

The plaintiffs in these consolidated actions appeal from a judgment of the Superior Court (Androscoggin County) finding that Vintners did not unlawfully refuse to permit its franchisee, Eastern of Maine, to assign its franchise rights to three other entities and that Vintners did not unlawful-

ly terminate its franchise relationship with Eastern of Maine. This case presents this Court, for the first time, with issues requiring the construction of the Certificate of Approval Holder and Maine Wholesale Licensee Agreement Act, 28 M.R.S.A. §§ 665–679 (Supp.1982) (Act).

## I. *Facts*

Vintners Group Ltd. (Vintners) is a New England supplier of Sebastiani wines, as well as five other brands of wine and one brand of beer. Its warehouse is located in Danvers, Massachusetts. Sebastiani and the other producers serviced by Vintners ship their products to Vintners's facility, and local wholesaler and distributors there take delivery of the goods to be sold to retailers. Testimony at trial established that Vintners was a certificate of approval holder within the meaning of section 665(2) of the Act. Title 28 M.R.S.A. § 604 requires "foreign" wholesalers of table wine to acquire a certificate of approval before transporting wine or causing it to be transported into the State of Maine.

Pursuant to the terms of section 667 of the Act, a certificate of approval holder may engage only one wholesaler to distribute the product of a single brand or label within any sales territory. For the five years preceding trial in these actions, Eastern of Maine, Inc. (Eastern) served as Vintners's exclusive wholesaler of Sebastiani wines for a sales territory in Maine described as that area south of a line running approximately from Point Jackman on the Canadian border to Stockton Springs and Searsport. Eastern's operational headquarters were in Lewiston and its three warehouses were in Augusta, Portland, and Lewiston.

In the fall of 1979, Eastern engaged in negotiations with United Distributors of Maine, Inc. (United) for the transfer of Eastern's entire franchise to United. Before executing a purchase and sale agreement, the president of United contacted Vintners and Vintners gave approval to the transfer. Prior to expressing this approval, Vintners surveyed those wholesalers and distributors, including Pine State Beverage (Pine State), which conducted operations in the sales territory covered by Eastern, and United was apparently found to be acceptable. That transfer, however, was never consummated.

On July 22, 1980, Eastern entered into a purchase and sale agreement with Dirigo Distributors (Dirigo), in which Eastern assigned to Dirigo Eastern's franchise rights to distribute Sebastiani wine in Cumberland and York counties. Robert LaBrie, president of Eastern, testified that because Eastern was unable to transfer the rights to the entire sales territory to a single wholesaler, Eastern attempted to fragment that area and to transfer segments to separate wholesalers. Vintners was not notified of the negotiations prior to the execution of the agreement.

Further, the evidence indicates that Vintners did not receive formal notice of *the consummated* transfer until Vintners received a copy of a letter dated August 26, 1980, sent by Eastern to the Maine Bureau of Alcoholic Beverages.[1] LaBrie testified to his understanding that he was not required to so inform Vintners. He said that he had informed Vintners of the 1979 negotiations with United simply to ensure a smooth transition from Eastern to United of operations under the franchise. LaBrie also testified that he inquired into Dirigo's capacity to manage the distribution of Sebastiani's products in York and Cumberland counties and, although he was satisfied that such a capacity existed, he did not inform Vintners of the nature of Dirigo's finances and operations.

Before the Eastern-Dirigo agreement was executed, Joseph Mozarkel, one of the two partners of Dirigo, notified Jerry Shanahan, an employee of Sebastiani who was apparently charged as liaison between his em-

---

1. Before this formal notice, however, Robert MacArthur of Vintners had learned that Sebastiani products were being sold in the Portland area by salesmen working for distributors other than Eastern.

ployer and Vintners. Similarly, LaBrie of Eastern testified that he contacted Shanahan immediately upon the execution of the transfer. Shanahan reportedly gave his blessing to the arrangement. Although the parties make much of the relationship between Shanahan and Vintners, there was evidently no confusion in 1980 that Shanahan was employed by Sebastiani *and not by Vintners.* LaBrie testified, however, that except when ordering and paying for the wine itself, Shanahan had been Eastern's "sole contact" in matters involving the Sebastiani product, particularly in promotional work. Further, Vintners had never rejected Shanahan's decisions respecting the product. This led to LaBrie's understanding that "Shanahan was the agent with whom you [LaBrie] were to deal in regard to the handling of the Sebastiani wine line."

In any event, after MacArthur of Vintners learned of the Eastern-Dirigo transfer, he met several times with LaBrie of Eastern and requested that Eastern surrender the Sebastiani franchise. The parties held these meetings, MacArthur testified, not to identify and correct deficiencies in Eastern's operations, but solely to effect Eastern's termination of the franchise relationship with Vintners. Indeed, LaBrie stated that Vintners never expressed dissatisfaction with Eastern's performance. MacArthur subsequently sent a letter dated September 12, 1980, to LaBrie requesting that Eastern not transfer distribution rights to Dirigo and that Eastern resign as the distributor for the Sebastiani line. MacArthur assigned three reasons for these requests: notice of the Eastern-Dirigo transfer was not provided to Vintners until after it was consummated; division of Eastern's sales territory would multiply the burdens of processing "orders, billings, sales plans, etc."; and Dirigo's physical facilities, notably its warehouse, were deficient.

MacArthur sent LaBrie a second letter, dated September 25, 1980. This was intended to be a notice of immediate termination of the franchise arrangement between Vintners and Eastern, rather than the ninety day notice facially required by section 669 of the Act. At some point during the fall of 1980, Vintners stopped supplying Eastern with Sebastiani wine, despite Eastern's request for more product.

Mozarkel of Dirigo testified that MacArthur visited him sometime in September 1980 to discuss the reasons why Dirigo was unacceptable as a transferee of part of the Eastern franchise. Both Mozarkel and MacArthur agreed that no inquiry was actually made into Dirigo's warehouse capacity. MacArthur, however, had prior dealings, involving another product, with Dirigo in 1978; as a result, he had records of Dirigo's physical plant as it existed at that time. No effort was made to investigate concerning whether improvements had been made or were anticipated. Indeed, when Dirigo entered into the transfer agreement with Eastern, it made provision to lease warehouse facilities which would increase its storage capacity by fifty percent and to add on to its own warehouse structure.

After the Eastern-Dirigo transfer, Dirigo assumed Eastern's function of distributing the Sebastiani product in York and Cumberland counties.[2] Dirigo's payment for the supply of product, made through Eastern, was made fourteen days after the thirty-day payment period had elasped. Eastern's credit record with Vintners was otherwise "excellent."

On September 22, 1980, Eastern executed a second purchase and sale agreement transferring approximately the northern third of its distribution territory to Colonial Distributors, Inc. (Colonial). Negotiations between these parties had begun during the summer of 1980. As in the transaction between Eastern and Dirigo, Vintners was not notified of the arrangement with Colonial until after the transfer had been executed. The letter providing that notice was dated September 26, 1980. Vintners never

**2.** Mozarkel of Dirigo testified that Vintners must have been aware of this arrangement as marked Dirigo trucks picked up an order of wine in Danvers.

responded to it. Vintners had, however, sent a letter dated September 25, 1980, to Eastern "terminating our assignment of Sebastiani products to Eastern." That letter also indicates that Vintners would appoint another distributor to cover Eastern's area of distribution.

Eastern assigned the remaining portion of its distribution territory, roughly the central third, to United on November 14, 1980. Again, Vintners had not been notified of this transaction until the third purchase and sale agreement was signed. Jonathan Lee, president of United, testified at trial that he was aware at the time of the Eastern-United transfer of the complications surrounding Eastern's transfers to Dirigo and Colonial. Indeed, Lee stated that he knew of Vintners's interest in securing another distributor to replace Eastern.

MacArthur of Vintners testified that United and Pine State were two of the wholesalers he had scrutinized during the winter of 1979–80 when Eastern sought to transfer its franchise intact. He found both to be satisfactory. MacArthur admitted at trial that he was considering Pine State as a replacement for Eastern when he sent his letter of September 12, 1980, to Eastern, requesting that the distributorship in York and Cumberland counties not be transferred to Dirigo and that Eastern resign. He testified that he arrived at that decision, to award the franchise to Pine State, after he learned that Eastern had sold the southern portion of its market to Dirigo, thereby fragmenting the distribution area. MacArthur's interest in Pine State was sparked, apparently, because Pine State was the only alternative distributor to Eastern that was then engaged in servicing the entire sales territory in question.

MacArthur had solicited from John Canning, the general manager of Pine State's beverage division, a proposal describing Pine State's physical facilities, organizational structure, and "the goals they would set up if they had the Sebastiani line." The report was evidently viewed favorably by Vintners as MacArthur, on October 8, 1980, notified Canning of Pine State that it was appointed distributor for Sebastiani products. The Maine Bureau of Alcoholic Beverages, however, notified MacArthur shortly thereafter that Vintners had not fulfilled the *statutory* procedures required in switching wholesale licensees and that Pine State therefore could not operate as its franchisee at that time. This prompted Vintners to withdraw Sebastiani products from the area entirely. Those statutory conditions have evidently been satisfied in the meantime because Pine State, as of August 14, 1981, was servicing the Sebastiani line in the area formerly controlled by Eastern.

Vintners presented evidence at trial to demonstrate the financial disadvantages of servicing the sales territory at issue here through three wholesalers, as contrasted to one distributor. The treasurer of Vintners Group, Dana Russell, testified that Vintners's cost per case of Sebastiani wine was $1.49 when sold through a single franchisee. With three wholesalers assigned to the same geographical area, however, the cost per case to Vintners would increase to $2.06. The increased cost, according to that testimony, is attributable to increased burdens in loading the wholesalers' trucks; greater use of Vintners's forklift; the cost per case of Vintners's office clerk, because of the greater volume of billings, inventory records, and tax records;[3] and increased costs of management. Additionally, MacArthur testified that the use of a single wholesaler in a larger geographical area tends to expedite the process of conveying promotional materials and products themselves to the market. ·

After several unsuccessful attempts among the parties to reach a settlement in which Pine State would receive franchise rights, Eastern commenced an action for injunctive and remedial relief against Vintners and Pine State. The complaint alleged, *inter alia,* that Vintners violated sec-

---

3. Massachusetts evidently requires that separate records be maintained for each wholesaler.

tion 670 of the Act by unreasonably withholding its consent to Eastern's transfer of its business, that it violated section 668 by terminating Eastern as a distributor without good cause, and that it violated section 669 by failing to provide the requisite notice.

Nearly three months later, Dirigo, Colonial, and United brought suit against Vintners.[4] These plaintiffs sought, *inter alia,* an order enjoining Vintners from terminating its distribution agreement with Eastern and from transferring any distribution rights "to anyone." The complaints in both cases sought specifically only the remedies of equitable relief, actual and punitive damages, and attorney's fees available as a judicial remedy under section 672 of the Act. Both alleged "bad faith" on the part of Vintners.

After consolidation of the two cases, a trial justice heard the plaintiffs' motion for preliminary injunction. The justice denied the motion. After further hearing, the justice entered final judgment for the defendants.

The trial justice found that Vintners "reasonably refused" to consent to Eastern's three transfers fragmenting its original "sales territory" because those transfers would require Vintners to deal with three distributors instead of one. As the evidence demonstrated that Pine State was the only wholesaler servicing the entire area, the justice held that Vintners's refusal to accede to the transfer to the other three entities was reasonable and not violative of section 670. Further, the trial justice held that because Eastern breached its distribution contract with Vintners by assigning its rights to another party without Vintners's consent, Vintners rightfully rescinded the contract by revoking Eastern's distribution rights. Appeals were seasonably filed.

**II.**

The decision below presents, for review, three conclusions of the trial justice: (1) that Vintners did not violate section 670 because Vintners "reasonably refused to consent to an assignment of distribution rights"; (2) that Eastern was barred from pursuit of the procedural rights and substantive remedies provided by the Act because of Vintners's right of rescission of the franchise with Eastern arising out of the attempted implementation by Eastern of the franchise transfers without obtaining the consent of Vintners; and (3) that the transfers to Dirigo, Colonial, and United were without legal effect absent Vintners's consent to those transfers.

**III.** *The Act*

We construe a statute to give effect to the purposes the Legislature intended to achieve in enacting the statute. *Cummings v. Town of Oakland,* 430 A.2d 825, 829 (Me. 1981), *cert. denied,* 454 U.S. 1134, 102 S.Ct. 988, 71 L.Ed.2d 286 (1982). In promulgating the provisions of the Certificate of Approval Holder and Maine Wholesale Licensee Agreement Act, the Legislature intended to address a perceived "economic imbalance which exists between wholesalers, their brewers and wineries who inherently have superior economic and bargaining power in the negotiation and enforcement of agreements" and "[t]o promote the compelling interest of the public in fair business relations between wholesalers, their brewers and wineries and in enhancing competition in the beer industry...." 2 Leg.Rec. 118, Senate (May 11, 1979); *see also* L.D. 776, Statement of Fact (109th Legis.1979) ("The law is necessary because of the unequal bargaining power of the certificate holder as compared to the wholesale licensee.")

In order to correct this economic imbalance, the Act prohibits nine categories of conduct[5] by the certificate holder.[6] A vio-

---

4. The complaint originally included counts against Eastern and LaBrie, but these were later voluntarily dismissed.

5. Under 28 M.R.S.A. §§ 665–679 (Supp.1982), the certificate of approval holder (1) may not

6. See note 6 on page 942.

lation of the majority of these prohibitions entitles the wholesaler to equitable relief under section 672. The prohibitions of sections 670 and 668 are relevant to the present inquiry. The conduct prohibited in sections 668 and 670 provide a basis for awarding equitable relief. Significantly, however, only the conduct proscribed by these two sections provides a basis for recovery of actual damages, punitive damages, costs, and attorneys fees under section 672 and of reasonable compensation, as determined by arbitration, for the value of the wholesaler's business under section 671.

### IV. Section 670: Vintners's Consent

Section 670 provides: "[n]o certificate of approval holder shall unreasonably withhold consent to any assignment, transfer or sale of the wholesaler's business whenever the wholesaler to be substituted meets the material and reasonable qualifications and standards required of its wholesalers." The trial justice ruled that Vintners's refusal to consent to Eastern's transfer of its business to Dirigo, Colonial, and United was not unreasonable under this section. In his order denying the request of Dirigo, Colonial and United for a preliminary injunction, dated April 16, 1981, the justice stated:

> While there is little doubt about the individual qualifications of the three wholesalers, with the possible exception of warehousing capacity, the division of the sales area creates multiple billing, delivery and sales transactions for Seaboard [Vintners].... [T]his Court is unable to

conclude it is beyond the bounds of reasonableness for Seaboard to insist upon preserving the integrity of a single sales unit under the circumstances of this case.

The justice reaffirmed this conclusion in his order denying a permanent injunction, dated October 13, 1981:

> I find that Vintners reasonably refused to consent to an assignment of distribution rights which would create relationships with three separate distributors where previously Vintners had had to deal with only one distributor. The facts supporting this finding are capable of two interpretations: the general manager could have decided not to accept the tripartite distribution system either because he entertained a preformed favoritism towards the current distributor, Pine State Beverage, or because during a tour of the area he came to the obvious and rational conclusion that Pine State was the only Company serving the entire distribution area. I find as a fact that the latter interpretation is correct. Vintners legitimately withheld consent to the transfer and thus did not violate 28 M.R.S.A. § 670.

We agree.

In enacting the Act, the Legislature intended to "address the economic imbalance" existing between certificate holders and wholesalers. The Legislature did not intend and the Act does not contemplate addressing the imbalance by tipping the scales in favor of the wholesaler. The express

---

induce or coerce, through economic sanctions, the licensee to take certain action or refrain from certain action regarding its wholesale business, § 666; (2) may not set up dual distributorships, § 667; (3) may not fix wholesale prices, § 673; (4) may not take retaliatory action against a wholesaler which complains to an appropriate authority concerning the certificate holder's conduct, § 674; (5) may not unreasonably require or prohibit changes in the management of the wholesaler, § 675; (6) may not require the wholesaler to waive compliance with the Act, § 676; (7) may not restrict the wholesalers' right to free association (wholesalers are similarly prohibited), § 679; (8) may not withhold consent to any transfer or sale of the wholesaler's business if the substitute wholesaler meets certain standards, § 670; and

(9) may not amend, cancel, or terminate an agreement except for good cause, § 668.

6. The term "certificate holder" is expressly defined in the Act to "mean a brewery, winery, vintner, broker, importer or out-of-state wholesaler." 28 M.R.S.A. § 665(2). Such entities are required under Chapter 15 of Title 28 to "obtain a certificate of approval from the Bureau of Alcoholic Beverages." 28 M.R.S.A. § 654. In this case, Vintners is in the position of a "certificate holder." Any local wholesaler of malt liquor or wine is prohibited from purchasing, or causing to be transported into the State or selling within the State any of such products unless they are purchased from a certificate holder. 28 M.R.S.A. § 652.

legislative goal of promoting "fair business relations" between certificate holders and wholesalers will be achieved by eliminating capricious and arbitrary action by the certificate holder against the wholesaler, not by sacrificing sound economic and business judgment, on which the certificate holder's business and any "business relations" depend.

■ The requirement in section 670 that the substitute wholesaler meet "the material and reasonable qualifications and standards required" by a certificate holder of its wholesaler supports this conclusion. Considering the financial and business advantages of having one wholesaler, as opposed to three wholesalers, responsible for the Maine territory in issue, Vintners's requirement of broad geographical coverage by its wholesalers was not an immaterial or unreasonable qualification. Based on these facts, the justice did not err in concluding that Vintners "reasonably refused" consent to Eastern's transfer of business to three wholesalers unable to meet the geographical coverage qualification.

7. Section 668 provides:
    **1. Good cause.** Notwithstanding the terms, provisions or conditions of any agreement, no certificate of approval holder shall amend, cancel, terminate or refuse to continue or renew any agreement, or cause a wholesaler to resign from an agreement, unless good cause can be established or proven for amendment, termination, cancellation, nonrenewal, noncontinuation or causing a resignation. "Good cause" shall not include the sale or purchase of a certificate of approval holder. "Good cause" shall include, but not be limited to, the following:
    A. Revocation of the wholesaler's license to do business in the State;
    B. Bankruptcy or insolvency of the wholesaler;
    C. Assignment for the benefit of creditors or similar disposition of the assets of the wholesaler; and
    D. Failure by the wholesaler to substantially comply, without reasonable excuse or justification, with any reasonable and material requirement imposed upon him by the certificate of approval holder.

8. Section 669 provides:

## V. Section 668: Cancellation

Eastern executed a purchase and sale agreement for part of its distribution territory to Dirigo on July 22, 1980, and to Colonial on September 22, 1980. Vintners received no prior notice of these transactions. Vintners sent a letter dated September 25, 1980, to Eastern terminating the Vintners-Eastern territorial assignment. Although Vintners had previously requested that Eastern not transfer distribution rights to Dirigo and that Eastern resign as Vintners's distributor, the September 25 letter was Eastern's first notice of termination.

Under section 668,[7] a certificate holder may not terminate an agreement with a wholesaler absent a showing of good cause. Under section 669,[8] a certificate holder must give a wholesaler notice of, and a reasonable time to correct, claimed deficiencies. After this reasonable time, the certificate holder must give the wholesaler ninety days prior written notice of the intent to terminate. Vintners did not comply with the procedural requirements of section 669. The trial justice ruled, however, that East-

    **1. Written notice.** Prior to any termination procedure initiated by the certificate of approval holder, a wholesaler shall be informed in writing of any claimed deficiency existing in his territory and shall be given reasonable time to correct the claimed deficiency or deficiencies. After this reasonable time has elapsed, a certificate of approval holder shall provide a wholesaler at least 90 days prior written notice of any intent to amend, terminate, cancel or not renew any agreement. The notice shall state all the reasons for the intended amendment, termination, cancellation or nonrenewal. The notice provisions of this section shall not apply if the reason for the amendment, termination, cancellation or renewal is:
    A. The bankruptcy or insolvency of the wholesaler;
    B. An assignment for the benefit of creditors or similar disposition of the assets of the business;
    C. Revocation of the wholesaler's license; or
    D. Conviction or a plea of guilty or no contest to a charge of violating a law relating to the business that materially affects the wholesaler's ability to remain in business.

ern had breached its distribution contract with Vintners by assigning Eastern's distribution rights to Dirigo, Colonial, and United without Vintners's consent. The justice concluded that because Eastern was in breach, Vintners could immediately rescind the distribution agreement. He further ruled that the notice requirements of section 669 did not apply "where the distributor has clearly breached the contract and precipitates rescission." We disagree.

■ The evidence in this case does not support a finding that Eastern violated the terms of its distribution agreement with Vintners by assigning its territory without Vintners's consent. The *terms* of any distribution agreement between Vintners and Eastern are unknown; this issue was not raised below. The record states only that Eastern had an oral exclusive distributorship with Vintners covering southern and western Maine.

Because the justice erroneously ruled that Eastern's breach of the distribution contract provided Vintners with an immediate right of rescission, the issue of the existence of good cause under section 668 was never reached. We therefore remand to the Superior Court for a determination of whether there existed "good cause" for termination under section 668.

### VI. *Section 669: Notice Procedure*

■ Moreover, even assuming that Vintners had a contractual right of rescission we cannot agree with the conclusion that that right automatically relieved Vintners of the need to comply with the notice requirements of section 669. The plain language of section 669 mandates reasonable notice requirements "[p]rior to *any termination.*" (Emphasis added.) We think "*any* termination" includes any termination for good cause under section 668 and any unlawful termination without good cause, compensated under section 671. "*Any* termination" quite plainly contemplates *every* contemplated cessation of a certificate holder-wholesaler relationship unless one of the four *exclusive* exceptions to the notice requirement stated in section 669 applies. None applies in this case.

Our conclusion is affirmed by the purpose of section 669 itself. By requiring the certificate holder to give the wholesaler notice of claimed deficiencies, the wholesaler receives a chance to rectify the perceived problem. Failing this, the ninety day notice allows the wholesaler to prepare for the termination of a distributorship. Compliance with both provisions of section 669 avoids the uncertainty in the status of a distributorship agreement, which often interfered with the business and investment security of wholesalers.

Finally, this conclusion is supported by the goals of the Act. The Legislature intended to reduce the unfair economic bargaining power that the certificate holders enjoyed at the expense of the wholesalers. By allowing a wholesaler's breach of a distribution agreement or a certificate holder's contractual defense to obviate compliance with the substance and procedures of the Act, we would restore the certificate holders' advantageous economic position. It seems that the situation here raises the specter, justified or not, contemplated by the Legislature: because a wholesaler breaches what the certificate holder considers a material factor in the distributorship relationship, the wholesaler's distributorship is cut off without notice and without a chance to remedy the problem. Labeling Vintners's action a "right of rescission" does not take this case out of the Act; rather, that label places this action squarely under the Legislature's protective provisions.

. We disagree with the justice's ruling that Eastern's breach and Vintners's resulting contractual remedy against Eastern *per se* relieved Vintners of compliance with the procedures of the Act. We will not elevate the principles of substantive contract law above the procedures of this Act when the ramifications of some of those principles were the very basis for the enactment of the Act.

## VII. *Section 671: Compensation*

Because the issue of compensation under section 671[9] may arise on remand, we consider briefly that section. Section 671 provides recovery of reasonable compensation to a wholesaler unjustifiably aggrieved by a certificate holder. Under the facts of this case, Eastern could be entitled to such compensation if, on remand, the court does not find good cause for Vintners's termination of the agreement with Eastern.[10] A finding of good cause, however, precludes recovery under section 671, even absent compliance with the section 669 notice requirements. The wholesaler's remedy for the certificate holder's violation of the notice requirements may lie within the provisions of section 672.

## VIII. *Eastern's Transfers*

 The trial justice ruled that because Eastern's transfer to the other wholesalers "was effectuated without the certificate holder's consent, it is deemed void and the assignees, Dirigo Distributors, Colonial Distributors, Inc., and United Distributors of Maine, take nothing." Because we agree that Vintners's refusal of consent was reasonable, we also agree with the justice's correct statement that Eastern's attempted assignments failed. 3 Williston, *Law of Contracts* § 442 at 302 (3d ed. 1960). Those transfers by Eastern to Dirigo, Colonial, and United were void; the transfer by Vintners to Pine State was not invalidated by any provision of the Act.

The entry is

Judgment for Vintners Group Ltd. against Dirigo Distributors, Colonial Distributors, Inc., and United Distributors of Maine, Inc. affirmed.

Judgment for Vintners Group Ltd. against Eastern of Maine, Inc. vacated and remanded for further proceedings consistent with this opinion.

All concurring.

---

9. Section 671 provides:

    **1. Reasonable compensation.** Any certificate of approval holder which amends, cancels, terminates or refuses to continue or renew any agreement, or causes a wholesaler to resign, unless for good cause shown, as defined in section 668, from an agreement or unreasonably withholds consent to any assignment, transfer or sale of a wholesaler's business, shall pay the wholesaler reasonable compensation for the value of the wholesaler's business with relationship to the terminated brand or brands. The value of the wholesaler's business shall include inventory and other tangible assets and its good will, if any.

    **2. Neutral arbitrator.** In the event that the certificate of approval holder and the wholesaler are unable to mutually agree on the reasonable compensation to be paid for the value of the wholesaler's business, as defined herein, the matter shall be submitted to a neutral arbitrator to be selected by the parties, or if they cannot agree, by the Chief Justice of the Supreme Judicial Court. All of the costs of the arbitration shall be paid ½ by the wholesaler and ½ by the certificate of approval holder or otherwise the arbitration proceeding shall be governed by the Maine Uniform Arbitration Act.

10. Our ruling that Vintners *reasonably* withheld consent to Eastern's transfers precludes section 671 compensation for that conduct.