SEAGRAM DISTILLERS COMPANY & others[1] *vs.* ALCOHOLIC
BEVERAGES CONTROL COMMISSION & another[2]
(and two consolidated cases[3]).

Suffolk. December 9, 1987. — February 18, 1988.

Present: HENNESSEY, C.J., LIACOS, NOLAN, & LYNCH, JJ.

*Alcoholic Liquors,* Wholesaler, Supplier. *Statute,* Construction. *Administrative Law,* Judicial review, Substantial evidence. *Corporation,* Sale of stock.

The Alcoholic Beverages Control Commission correctly determined that a wholesale liquor distributorship agreement between a distiller and a corporate wholesaler could properly be terminated for "good cause" under G. L. c. 138, § 25E, for the wholesaler's failure to comply with the "terms of sale agreed upon," where the agreement contained a clause providing for its termination by either party upon a sale or transfer of control or management of either party, and where a sale of all the capital stock of the wholesaler occurred. [716-719]

Sale of all the capital stock of a corporate liquor wholesaler, which had no legal effect on the wholesaler's license to sell liquor, did not constitute "good cause" under G. L. c. 138, § 25E, for a distiller's termination of the wholesaler's liquor distributorship, in the absence of any provision in the distributorship agreement permitting its termination under such circumstances. [719-720]

Substantial evidence supported the findings of the Alcoholic Beverages Control Commission, after a hearing held pursuant to the provisions of G. L. c. 138, § 25E, that a certain corporate entity remained the same despite a change of its name, that the sale of the corporation's stock did not amount to a sale of its assets, and that a distiller's termination rights contained in a wholesale liquor distributorship agreement with the corporation had not been waived. [720-723]

---

[1] The Seagram Classics Wine Company, The Seagram Wine Company, General Wine and Spirits Company, Summit Sales Company, and Calvert Distillers, all sales divisions of Joseph E. Seagram & Sons, Inc.

[2] Country Club Wine & Spirits, Inc.

[3] Country Club Wine & Spirits, Inc. *vs.* Seagram Distillers Company & Alcoholic Beverages Control Comm'n. "21" Brands, Inc. *vs.* Alcoholic Beverages Control Comm'n & Country Club Wine & Spirits, Inc.

In a proceeding for judicial review of a decision of the Alcoholic Beverages
    Control Commission, this court declined to consider a party's challenges
    to the constitutionality of G. L. c. 138, § 25E, which had not been
    raised before the commission. [724]


CIVIL ACTIONS commenced in the Superior Court Department
on August 15, 1985, and August 23, 1985, respectively.

The cases were consolidated for trial and were heard by
*Elbert Tuttle,* J.

CIVIL ACTION commenced in the Superior Court Department
on December 19, 1985.

The case was considered by *Elbert Tuttle,* J., on a stipulation
by the parties.

The Supreme Judicial Court on its own initiative transferred
the cases from the Appeals Court.

*Gerald J. Caruso* for Seagram Distillers Company & others.

*Joseph B. Pritti* of New York for "21" Brands, Inc.

*Evan T. Lawson (William F. Coyne, Jr.,* with him) for
Country Club Wine & Spirits, Inc.

*Douglas H. Wilkins,* Assistant Attorney General, for Al-
coholic Beverages Control Commission.

LYNCH, J. Two liquor distillers and a liquor wholesaler cross
appeal from Superior Court judgments affirming two decisions
of the Alcoholic Beverages Control Commission. The primary
issue involved is what constitutes "good cause" termination by
the supplier of a wholesale liquor distributorship agreement
under G. L. c. 138, § 25E.[4] The parties also allege other errors

---

[4] General Laws c. 138, § 25E (1986 ed.), provides in pertinent part: "It
shall be an unfair trade practice and therefor unlawful for any manufacturer,
winegrower, farmer-brewer, importer or wholesaler of any alcoholic bever-
ages, to refuse to sell, except for good cause shown, any item having a
brand name to any licensed wholesaler to whom such manufacturer, wine-
grower, farmer-brewer, importer or wholesaler has made regular sales of
such brand item during a period of six months preceding any refusal to sell.
" . . . .

"Upon application by the wholesaler to the commission, the commission
shall order the manufacturer, importer or wholesaler giving notice of refusal
to sell to continue to make sales in the regular course to such wholesaler
pending determination by the commission on the merits of said appeal. The
commission shall after notice to all parties and hearing, make a determination

of law and question the sufficiency of and support in the evidence for findings of the Alcoholic Beverages Control Commission (commission). The distillers also attack the constitutionality of G. L. c. 138, § 25E. We took the cases on our own motion and affirm the decisions of the Superior Court.

We summarize the facts. Seagram Distillers Company (Distillers) is a division of Joseph E. Seagram & Sons, Inc. (Seagram), a large liquor distiller. In 1973, Distillers entered into a distributorship agreement for a number of brands of liquor with a wholesaler, Country Club Wine & Spirits, Inc.[5] (Country Club). The agreement was renewed in 1974 and 1975, and continued thereafter on a month-to-month basis. The agreement contained a cancellation clause, permitting either party to cancel upon the "[s]ale or transfer of control or management of the other party."

In October, 1984, Paul Rubin, then the sole shareholder of Country Club, sold all of the capital stock in the corporation to Charles Gilman & Sons, Inc. (Gilman).[6] Distillers thereupon notified Country Club that it was cancelling the distributorship agreement under the terms of the cancellation clause.

Country Club also had distributorship agreements with other Seagram divisions and with "21" Brands, Inc., but none of these was covered by written contract. The other Seagram divisions notified Country Club that these agreements were

on the issue of good cause and grant such relief as may be appropriate under the circumstances. Good cause as used herein shall be limited to the following conduct:

(a) disparagement of the product so as to impair the reputation of the brand owner or the brand name of any product,

(b) unfair preferment in sales effort for brand items of a competitor,

(c) failure to exercise best efforts in promoting the sale of any brand item,

(d) engaging in improper or proscribed trade practices, or

(e) failure to comply with the terms of sale agreed upon between supplier and wholesaler."

[5] At the time of the agreement, the wholesaler's name was Country Club Soda Co., Inc. The name was later changed to Country Club Wine & Spirits, Inc.

[6] According to Seagram, when Rubin sold Country Club's stock to Gilman, all of the stock ownership, officers, directors, management and general business operations of the corporation changed, and the corporation moved its headquarters. Prior to the stock sale, Country Club had transferred all assets unrelated to liquor sales to a new corporation.

terminated as well, citing the cancellation clause in the written agreement between Country Club and Distillers. "21" Brands also sought to cancel its agreement.[7]

Upon receipt of the notices of cancellation, Country Club applied to the commission for relief under G. L. c. 138, § 25E. The commission determined that the distributorship agreement could properly be terminated under G. L. c. 138, § 25E, where the distributorship agreement contained a clause providing for termination upon a transfer of management or control, but where the agreement did not contain such a clause, a sale of stock by the wholesaler did not constitute the requisite "good cause" under § 25E to justify termination.

1. *Termination under contract.* Subparagraph (*e*) of G. L. c. 138, § 25E, defines "good cause" for termination of a distributorship agreement as "failure to comply with the terms of sale agreed upon between supplier and wholesaler." Country Club argues that the portion of commission's decision permitting termination where there is a written cancellation clause violates the spirit of § 25E, and that the phrase "terms of sale" cannot be interpreted as including a cancellation clause such as the one at issue here. Seagram responds that the commission's decision strikes the proper balance between suppliers' and wholesalers' interests, and that "terms of sale" may properly include a clause providing for termination upon a change in management or control.

The legislative history of § 25E is sparse. However, the Justices have expressed their opinion that the purpose of a related section of chapter 138 is to counteract the tendency toward vertical integration in the liquor industry — the so-called "tied house" evil. See *Opinion of the Justices,* 368 Mass. 857, 861-862 (1975) (construing G. L. c. 138, § 18). Further, § 25E appears to be one of "a number of statutes enacted in this Commonwealth in recent years to redress the economic imbalance in particular relationships . . . ." *Amoco Oil Co.* v. *Dickson,* 378 Mass. 44, 49 (1979). See *Commonwealth* v. *DeCotis,* 366 Mass. 234, 238 (1974). In sum, the statute serves

---

[7] "21" Brands has adopted the arguments of Seagram on this appeal.

as a vehicle by which the commission may reconcile the competing equities between suppliers and wholesalers of liquor in the Commonwealth. See *Eastern of Me., Inc.* v. *Vintners Group Ltd.,* 455 A.2d 936, 941 (Me. 1983) (construing Maine liquor statute similar to § 25E). Cf. *Amoco Oil Co.* v. *Dickson, supra* at 50 (construing former G. L. c. 93E, § 5A, as appearing in St. 1976, c. 64, § 5). Bearing these purposes in mind, we discern no error in the commission's interpretation and application of § 25E.

"Persons in a highly sensitive, closely scrutinized business (such as the liquor business) have need to know about and appraise the persons behind corporations with whom they are doing business." *Union Liquors Co.* v. *Alcoholic Beverages Control Comm'n,* 11 Mass. App. Ct. 936, 938 (1981). A cancellation clause represents a reasonable method by which suppliers and wholesalers alike may protect their freedom to choose with whom they will deal. *Id.* We comprehend nothing in the language or intent of § 25E which acts to countermand that contractual freedom.

Country Club argues, however, that allowing suppliers to use cancellation clauses may unconscionably exploit the inequality of bargaining power between suppliers and wholesalers, effectively permitting suppliers to write their own definitions of "good cause."

While it may be true that suppliers enjoy superior bargaining power over wholesalers, this fact alone does not warrant the conclusion that agreements between the parties are unconscionable. See *Zapatha* v. *Dairy Mart, Inc.,* 381 Mass. 284, 291-295 (1980). Indeed, the degree of bargaining advantage enjoyed by suppliers is itself open to question. There is testimony in the record indicating that the Massachusetts wholesale liquor industry may soon be comprised of only four or five large Statewide distributors. Thus, the wholesalers enjoy some measure of concentrated market power.

Furthermore, liquor wholesalers are not in the position of single-product franchisees, dependent on the supplier for their very livelihood. A wholesaler may handle a number of distinct, competing product lines. While a wholesaler may suffer in terms

of prestige and market share by losing a particular supplier's product line, he will not thereby ineluctably lose his entire business. Wholesalers also retain the right to appeal to the commission if they believe a termination has been made other than for "good cause." See G. L. c. 138, § 25E. The commission has already imposed a requirement that any breach of terms of sale be "material." *Whitehall Co.* v. *Guild Wineries & Distillery, Inc.,* ABCC decision, February 27, 1986. Therefore, wholesalers are not helpless victims but rather enjoy some degree of economic bargaining power and the "good cause" termination provision of § 25E.

Country Club argues that the provision of the statute permitting cancellation for good cause because of failure to comply with "terms of sale agreed upon" cannot be read to permit a cancellation clause as broad as the one at issue here. In support of its argument, Country Club cites cases from other jurisdictions holding that "terms of sale" means only such terms as price, quantity and kind of goods or the time for payment. See *Southern New England Tel. Co.* v. *Public Utils. Comm'n,* 144 Conn. 516 (1957); *Stancroff* v. *Brown,* 76 Mich. App. 589 (1977); *Federal Land Bank* v. *Miller,* 199 Miss. 615 (1946); *Clovis* v. *Southwestern Pub. Serv. Co.,* 49 N.M. 270 (1945). Seagram cites cases from still other jurisdictions for the proposition that "terms of sale" is not restricted to the above categories. *Platter* v. *Commissioners of Elkhart County,* 103 Ind. 360 (1885). *Matter of Masters,* 49 N.C. App. 322, 326 (1980).

We need not choose sides in this battle of citations. The phrase "terms of sale" is to be interpreted in the context of the whole statute. *Selectmen of Topsfield* v. *State Racing Comm'n,* 324 Mass. 309, 312 (1949). The commission — the agency charged with interpreting and enforcing the "good cause" provision of § 25E — has construed the statutory language as permitting the kind of cancellation clauses at issue here. That interpretation is entitled to this court's deference. *Amherst-Pelham Regional School Comm.* v. *Department of Educ.,* 376 Mass. 480, 491-492 (1978). The Appeals Court, as well, has upheld determinations that "terms of sale" denotes more than

price, quantity, kind, and payment terms. *New England Liquor Sales Co.* v. *Alcoholic Beverages Control Comm'n,* 16 Mass. App. Ct. 921 (1983). *Union Liquors Co.* v. *Alcoholic Beverages Control Comm'n,* 11 Mass. App. Ct. 936 (1981). Since those cases were decided, the Legislature has amended § 25E without altering the "terms of sale" language. See St. 1982, c. 627, § 10. From this we may infer the Legislature's approval of the commission's construction of the statute. See *Luacaw* v. *Fire Comm'r of Boston,* 350 Mass. 326, 328-329 (1966).

Country Club claims that this interpretation of § 25E leaves wholesalers with less protection than they would have without the statute. In making this argument, the wholesaler relies on *Larese* v. *Creamland Dairies,* 767 F.2d 716, 717 (10th Cir. 1985), which held that a franchisor could not unreasonably withhold consent to an assignment of the franchise where the franchise agreement conditioned assignment upon the franchisor's consent. However, even if we assume that the rule of the *Larese* case has application here, it does not stand for the proposition that the parties to the franchise agreement could not *contract* for an absolute right of consent.

The wholesaler argues at some length that this court should impose a duty of reasonableness on the supplier in exercising its right to terminate under the contract. This argument was not raised either before the commission or in the Superior Court. Hence, it may not be raised for the first time here. *M.H. Gordon & Son* v. *Alcoholic Beverages Control Comm'n,* 386 Mass. 64, 67-68 (1982), and cases cited.

2. *Terminations in absence of written contract.* The commission also applied the provisions of § 25E to the relationship between Country Club and the other Seagram divisions and "21" Brands where no written agreement existed. Seagram argues that the statute has no application because the sale of stock created a new entity with which it had not previously done business.

Seagram's argument assumes that a sale of stock in a corporate liquor wholesaler constitutes a transfer of that corporation's license to sell liquor. The short answer to this assumption is

that a sale of stock does not effect such a transfer.[8] The transaction between Rubin and Gilman had no legal effect on the license held by Country Club. Cf. *Griffin's Brant Rock Package Store, Inc.* v. *Alcoholic Beverages Control Comm'n,* 12 Mass. App. Ct. 768, 772 (1981) (entrusting management duties to another not a license transfer).

It is a basic tenet that a corporation is a legal entity distinct from its shareholders. *Marsch* v. *Southern New England R.R.,* 230 Mass. 483, 497-498 (1918). "Once the corporate existence has begun, even though the stockholders, directors and corporate name may change, the corporation retains the same rights, liabilities and responsibilities until dissolved." 6 W. Fletcher, Cyclopedia of Corporations § 2456 (perm. ed. 1979 & Supp. 1986), citing *Continental Bankers Life Ins. Co. of the South, Inc.* v. *Simmons,* 561 S.W. 2d 460, 464 n.2 (Tenn. App. 1977).[9] See generally Peairs, Business Corporations §§ 6, 7, 10 (1971 & 1985 Supp.), and cases cited.[10] We discern no reason of policy or legislative intent in this case which would justify disregarding the corporate form.[11] Therefore, we reject Seagram's claim, and we agree with the commission that Country Club is entitled to the protection of § 25E.

3. *The parties' other statutory claims.* In addition, both Seagram and Country Club claim that certain of the commis-

---

[8] The parties do not dispute that the license was held by the corporation. It is clear that corporations may legally hold such licenses. See G. L. c. 138, §§ 18 and 23 (1986 ed.).

[9] For these same reasons, we reject Seagram's argument that the commission acted arbitrarily and capriciously in finding that Country Club Wine & Spirits, Inc., was the same legal entity as Country Club Soda Co., Inc.

[10] The Legislature itself has recognized this elementary distinction in the context of retail licenses. See G. L. c. 138, § 15A (1986 ed.) (commission must approve sale of retailer's stock).

[11] In *Cleary* v. *Cardullo's, Inc.,* 347 Mass. 337, 346-350 (1964), we disregarded the corporate form in holding that Cardullo's was in violation of G. L. c. 138, § 15, which proscribed the ownership of more than three package store licenses by any one person, combination of persons or corporation, whether "directly or indirectly, or through any agent, employee, stockholder, officer, or other person or any subsidiary whatsoever. . . ." As the quoted language indicates, the statute clearly mandated that we look through the corporate form. No such mandate is apparent in § 25E.

sion's findings were not supported by substantial evidence. Country Club alone asserts that the commission made various errors of law and failed adequately to explain its decision. We reject these claims.

We sustain the decision of the commission if it is supported by substantial evidence. *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 657 (1982). *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Comm'n,* 372 Mass. 152, 153 (1977). *Almeida Bus Lines, Inc.* v. *Department of Pub. Utils.,* 348 Mass. 331, 342 (1965). Judicial inquiry under the substantial evidence test is limited to determination of whether, within the record developed before the administrative agency, there is such evidence as a reasonable mind might accept as adequate to support the agency's conclusion. *Labor Relations Comm'n* v. *University Hosp., Inc.,* 359 Mass. 516, 520-521 (1971). G. L. c. 30A, § 1(6). If there is such evidence, we affirm the agency's action even though we might have reached a different result if placed in the position of the agency. *School Comm. of Wellesley* v. *Labor Relations Comm'n,* 376 Mass. 112, 120 (1978). *Labor Relations Comm'n* v. *University Hosp. Inc., supra* at 521.

"It is for the agency, not the courts, to weigh the credibility of witnesses and resolve factual disputes." *School Comm. of Wellesley* v. *Labor Relations Comm'n, supra* at 120. *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.,* 380 Mass. 919, 930 (1980). *Number Three Lounge, Inc.* v. *Alcoholic Beverages Control Comm'n,* 7 Mass. App. Ct. 301, 309 (1979). We accord "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14(7). *Dohoney* v. *Director of the Div. of Employment Sec.,* 377 Mass. 333, 337 n.3 (1979). We "give due weight to [the commission's] specialized knowledge affecting the regulation of the sale of alcoholic beverages." *Connolly* v. *Alcoholic Beverages Control Comm'n,* 334 Mass. 613, 618 (1956), quoted in *Great Atl. & Pac. Tea Co.* v. *License Comm'rs of Springfield,* 387 Mass. 833, 836 (1983).

Seagram argues that there was no substantial evidence for the commission's findings that (1) Country Club was the same entity that entered into the original distributorship agreement with Distillers, and (2) the sale of stock from Rubin to Gilman was not a sale of assets. Both findings are supported by substantial evidence.

There was evidence that the 1973 distributorship agreement designated "Country Club Soda Co., Inc." as distributor. The agreement was signed "Country Club Soda Co., Inc., Distributor by: Maurice Elion, President." The record contains the articles of amendment by which Country Club Soda Co., Inc., changed its name to Country Club Wine & Spirits, Inc. Furthermore, the stipulated facts show that Seagram "sold brand name alcoholic beverages to Country Club Soda Co., Inc." Finally, testimony disclosed that Country Club Wine & Spirits, Inc., was the same corporate entity that Rubin had owned. On this evidence, the commission could fairly decide that Country Club Wine & Spirits, Inc., was the same corporate entity as Country Club Soda Co., Inc., the party to the 1973 distributorship agreement.

As to the finding that the sale of stock was not an asset sale, Seagram concedes that the transaction was a sale of shares, that Country Club was liable for the accounts payable allocable to the liquor business, that Country Club's balance sheet indicated that the corporate entity was still intact, and that the transaction did not appear to be a sale of assets. On these facts the commission could conclude that the transaction between Rubin and Gilman was a sale of stock, not an asset sale.

For its part, Country Club claims that the commission erroneously concluded that Distillers did not waive its right to terminate Country Club under the 1973 agreement.

The commission found that the 1973 contract "contained an 'evergreen' clause providing for its continued effect." That clause required 30 days advance notice of an intent not to renew the contract. Since Country Club does not contend that such notice was given, the contract remained in force on its face. Cf. *Milona Corp.* v. *Piece O'Pizza of Am. Corp.,* 1 Mass.

App. Ct. 839, 840 (1973). There was also evidence in the record that the parties continued to abide by the terms of the contract. Hence, the commission's finding that the 1973 distributorship agreement remained in force contained no error of law and was supported by substantial evidence.[12]

There was also no error in the commission's finding that Distillers had not waived its right to terminate Country Club's written distributorship agreement. The evidence as to waiver was conflicting. The question of waiver was a question of credibility of witnesses and weighing of the evidence, tasks which are for the commission, not this court, to perform.

Furthermore, the commission put a different construction on the evidence from that advanced by Country Club; the commission found that "to the extent these conversations [between Rubin and Nussman, and various Seagram employees] occurred the Commission does not find they constituted a waiver. The principals, both buyer and seller, of Country Club were aware that the employees did not have the authority to bind Seagram on the question of termination." When a person knows of an agent's lack of authority or knows of a limit on that authority, he cannot reasonably rely on the agent to bind the principal. *Costonis* v. *Medford Hous. Auth.,* 343 Mass. 108, 113 (1961). *Hennessey* v. *Cities Serv. Ref. Co.,* 282 Mass. 487, 490 (1933).

The evidence was sufficient to enable the commission to conclude that Seagram had not waived its rights to terminate the distributorship agreement.[13]

---

[12] Country Club complains that the commission failed to make adequate findings to support its conclusion. Elaborate findings on this simple factual issue were not required. The commission found that the contract contained an "evergreen clause," that two renewals were signed and thereafter the parties continued to abide by the terms of the agreement without complaint. This is sufficient explanation for this court to perform its reviewing function. See *School Comm. of Chicopee* v. *Massachusetts Comm'n Against Discrimination,* 361 Mass. 352, 354-355 (1972).

[13] We note that the agreement itself contained a clause providing that no "waiver . . . of any of the provisions hereof shall be binding upon either party, unless in writing and signed by an officer thereunto authorized." There is no evidence in the record of a written waiver.

4. *Seagram's constitutional claims.* Seagram contends that § 25E, on its face and as applied, violates various provisions of the United States Constitution and the Massachusetts Declaration of Rights. These claims were not raised before the commission and we therefore decline to consider them here for the first time. *Gurry* v. *Board of Pub. Accountancy,* 394 Mass. 118, 126 (1985). *Albert* v. *Municipal Court of the City of Boston,* 388 Mass. 491, 493 (1983). *Shamrock Liquors, Inc.* v. *Alcoholic Beverages Control Comm'n,* 7 Mass. App. Ct. 333, 335 (1979).

*Judgments affirmed.*