NUMBER THREE LOUNGE, INC. *vs.* ALCOHOLIC
BEVERAGES CONTROL COMMISSION.

Suffolk.    February 21, 1979. — March 28, 1979.

Present: BROWN, GREANEY, & KASS, JJ.

*Alcoholic Liquors*, License. *Alcoholic Beverages Control Commission*, Revocation of license. *Administrative Law*, Findings, Judicial review.

In a proceeding before the Alcoholic Beverages Control Commission, there was substantial evidence to support the commission's findings that a licensee had violated a commission rule by submitting in a license transfer petition and two license renewal applications false information concerning the identity of the true owners of the lounge holding the license, the identity of its actual treasurer, and the fact that the capital stock had been pledged to secure repayment of a corporate debt. [308-310]

The Alcoholic Beverages Control Commission did not err in construing a rule requiring licensees to disclose persons having an "indirect interest" in the license to require disclosure of persons having a beneficial interest in, or control over, the licensee's assets. [310-312]

The Alcoholic Beverages Control Commission did not abuse its discretion in revoking a lounge's license for purposeful violations of a commission regulation concerning disclosure of persons with indirect interests in the license. [312-313]

CIVIL ACTION commenced in the Superior Court on December 31, 1976.

The case was heard by *Sahady*, J., a District Court judge sitting under statutory authority.

*Francis J. DiMento* for the plaintiff.

*Kathleen King Parker*, Assistant Attorney General, for the defendant.

GREANEY, J. By its appeal the Number Three Lounge, Inc.,[1] challenges a judgment which affirmed, after review

---

[1] The plaintiff does business as the "Teddy Bear Lounge," and is sometimes referred to herein as the lounge.

under G. L. c. 30A, § 14, a decision and orders of the Alcoholic Beverages Control Commission (commission). The plaintiff raises three primary issues on appeal: that the decision of the commission is not supported by substantial evidence, that it is undermined by an error of law, and, if the decision is found not to be so flawed, that the commission's remedy of revoking the plaintiff's license[2] was too severe in all the circumstances. The commission based its action on findings that the plaintiff had violated rule nine of the commission's rules and regulations[3] seven times by submitting in a license transfer petition and two license renewal applications to the Licensing Board for the city of Boston (board) false information concerning the identity of the true owners of the lounge,[4] the identity of its actual treasurer,[5] and the fact that the capital stock of the lounge had been pledged to

---

[2] The commission also suspended the plaintiff's license for 120 days to run concurrently with the revocation of the license. The plaintiff on appeal focuses principally on the revocation of the license as the more severe of the two remedies and concentrates its arguments on it.

[3] Rule nine reads as follows: "All applications shall be made under the penalties of perjury and any false statement contained in any application shall be a cause or ground for refusing to grant the license or permit or for suspending, cancelling or revoking a license or permit already granted." A transfer application filed with the Licensing Board for the city of Boston requires a statement warranted under the penalties of perjury, as to the names of the corporate officers and the number of shares they hold in the corporation. It also requires a further warranty to the effect that no person, other than the officers and stockholders named in the transfer papers, has a direct or indirect interest in the license. The license renewal applications which must be filed annually with the same board require similar information, and also require an additional disclosure as to whether any of the corporate stock is pledged, and if so, to whom.

[4] The forms as filed indicated Patrick Vidette as the owner of all of the corporation's outstanding capital stock; the commission found that he was in substance a straw for the interests of the George E. Tecci family.

[5] The forms as filed indicated Vidette to be the treasurer; the commission found that George J. Tecci was in fact the treasurer.

secure repayment of a corporate debt.[6] The suspension order was predicated upon the plaintiff's false report with reference to the pledge of its stock, while the license revocation order was based upon the commission's findings that the information reported as to the lounge's ownership was false, and that persons other than those identified as the owners in the forms in fact held a substantial indirect interest in the lounge. We hold that the judge was correct in affirming the commission's decision and orders.

Judicial review of a decision of the commission is "confined to the record, except that in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken in the court." G. L. c. 30A, § 14(5), as amended by St. 1976, c. 411. The judge may set aside the agency's decision only if it is "[u]nsupported by substantial evidence," G. L. c. 30A, § 14(7)(e), as so amended, substantial evidence meaning "such evidence as a reasonable mind might accept as adequate to support a conclusion," G. L. c. 30A, § 1(6), as amended through St. 1978, c. 552, § 13. On the record we find substantial evidentiary support for the conclusions reached by the commission. The nub of the problem before the commission was to determine which of two branches of a family tree really owned or controlled the lounge.[7] The commission concluded that the Tecci family in fact controlled the lounge, that Patrick Vidette was merely a straw, and as a result, an indirect interest of some substance in the lounge had gone unreported. We summarize the evidence that impelled the commission to this conclusion in some detail.[8]

---

[6] Certain of the forms as filed stated that the stock was unencumbered; the commission found that it was in fact pledged to Alfonso Aucella to secure a $50,000.00 indebtedness.

[7] The branches consisted on the one hand of the Tecci family, George E. Tecci, his wife Catherine Tecci, and his son George J. Tecci; and on the other, George E. and Catherine's daughter Margaret Vidette and son-in-law Patrick Vidette.

[8] The evidence was presented to the commission through seventeen

Late in 1973, George E. and Catherine Tecci learned of the availability of a business opportunity to purchase all of the outstanding capital stock (consisting of 200 shares) of the lounge then owned by Alfonso Aucella (Aucella). Ownership of the stock carried with it ownership of an on-premises liquor license.[9] Pursuant to this opportunity, Catherine Tecci, on February 25, 1974, concluded a purchase and sale agreement with Aucella to purchase all of the lounge's capital stock for a total purchase price of $125,000. The terms of the agreement called for payment of the price by way of a $10,000 cash deposit when the contract was signed, a payment of $65,000 in cash at the closing, and payment of the balance through a $50,000 note secured by a pledge of the stock. Catherine bound the deal with her $10,000 personal check. Her husband, George E. Tecci, was present when the agreement was signed.[10] Catherine and Aucella then applied to the board on February 26, 1974, to request approval for the transfer of all of the stock from Aucella to Catherine, for approval of the pledge of the stock as security for the balance of the purchase price, and for a change of officers from Aucella as president and treasurer to Catherine as president and treasurer. The board was concerned with the role of Catherine's husband George E. Tecci in the new corporate scheme and requested information from Catherine on that point. She replied in a letter to the board that her husband would be the "host" at the lounge. On March 6, 1974, the Teccis were informed by the board that the transfer would not be approved, primarily because of the presence of George E. Tecci in the background.[11] After the

___

witnesses and forty-seven exhibits, pursuant to a complaint filed with the commission by the district attorney for the Suffolk district.

[9] The license was issued under the terms of G. L. c. 138, § 12.

[10] There was testimony that George E. Tecci had made the proposal regarding the purchase to Aucella.

[11] There was no challenge made to the board's rejection of the transfer petition on this basis.

rejection, George E. Tecci approached his son-in-law Patrick Vidette and persuaded him to become the purchaser of the lounge, at least on paper, with the funds necessary to complete the purchase to be loaned by the Teccis to Patrick. Catherine then assigned her rights under the agreement to Patrick.[12] A new corporate structure was assembled in which Patrick was named president and treasurer and his wife Margaret clerk. At the same time the lounge opened a corporate checking account at a local bank and named George J. Tecci (George E. and Catherine's son) as the treasurer and as the only person authorized to sign checks. A new transfer petition was filed with the board naming Patrick Vidette[13] as transferee.

The board became concerned over this quick turnabout and pressed Patrick at the hearing conducted on the resubmitted transfer petition on the questions of the actual ownership of the lounge and the source of its capitalization. Patrick testified before the board that he was the sole stockholder, that his own money was used to purchase the stock, that George E. Tecci would not be employed as a host if Patrick "could help it," and that he (Patrick) "would be responsible for everything." Specifically relying on these representations, the board approved the transfer.

The transaction then went to closing with Aucella, Catherine, George E. and Patrick present as principals. Catherine paid the remaining $65,000 due on equity with her own personal funds. Patrick, George E. and Catherine signed a $50,000 note to Aucella for the balance of the purchase price,[14] and Patrick endorsed the stock certifi-

---

[12] Patrick and Margaret Vidette admitted before the commission that they did not have sufficient cash to even begin to meet the $75,000 cash payment obligations required by the agreement.

[13] The first falsification occurred here when Patrick listed himself as treasurer, not reporting the content of the resolution appointing George J. Tecci as the treasurer and the person with sole control over the corporation's bank account.

[14] Aucella apparently had misgivings about the financial stability of

cate delivered to him at the closing back to Aucella in blank, together with a security agreement pledging the stock as collateral for the note. Thereafter, the lounge again certified to its bank that George J., not Patrick, was the corporate treasurer and the only person authorized to deal with the corporation's funds, and permitted its accountant to set up the $75,000 in cash disbursed to Aucella at, and prior to, the closing on the corporate books as loans payable by the corporation to George E. and Catherine Tecci respectively.[15]

---

Patrick and as a result insisted on the assurances of George E. and Catherine as comakers on the note.

[15] There was a considerable amount of accounting testimony produced before the commission. The lounge's first accountant testified that the original cash equity in the venture was established as corporate liabilities due to the Teccis, that he did not know anything about the "Tecci's lending that money to Mr. Vidette," and that he never dealt with Vidette. Corporate checks were issued after the closing in April, 1974, to liquidate a large portion of the liabilities carried on the books as owed to the Teccis. In June, 1976, after an investigation into the affairs of the lounge had been commenced by the Suffolk district attorney's office, the corporation changed accountants. The second accountant changed the designation of the money due to the Teccis on the corporation's books from corporate loans payable to loans receivable owed by Vidette to the corporation. An expert presented before the commission by the district attorney testified that he had examined all the accounting papers and records of the corporation and that despite contrary labelling by the lounge's second accountant, the lounge had treated the money advanced by the Teccis as a corporate liability due to them and liquidated it in that manner. The commission took this as additional evidence of an indirect interest in the lounge by the Teccis, and that the second accountant's efforts were designed primarily to get the Teccis' names off the books and to make the substantial amount of corporate funds paid to the Teccis look less suspect. The plaintiff strenuously objects to the commission's interpretation of the accounting evidence. While we recognize that accounting theory and practice are subject to many interpretations, there was sufficient evidence before the commission to justify the inferences and conclusions it drew from the accounting aspects of the case. Both accountants had also filed certificates of condition annually with the State Secretary's office, as required by G. L. c. 156B, § 109, listing the Videttes as the corporation's sole officers and Patrick as the sole stockholder.

There was evidence before the commission that after the lounge commenced business Patrick did not receive compensation in hand from it. From the date of the closing until at least June, 1976, the salaries paid out by the corporation, insofar as material to the issues before the commission, were disbursed to George E., Catherine, and their son George J. Tecci. Patrick was ascribed a "salary" of $25,000 by George J. Tecci, but that entire amount was remitted directly by the corporation through the son, George J. to Catherine and her husband to repay the $75,000 in cash advanced by them prior to and at the closing. George J. also directed checks from the corporation's account on a weekly basis to Aucella to liquidate the balance due on the $50,000 note.

There was additional evidence to indicate that George J. Tecci in the main managed and controlled the daily operations of the lounge, and that he did all of the hiring, interviewing, firing, writing of checks, and depositing and withdrawing of funds for the corporation. Patrick admitted he spent little time at the lounge and when he was at the premises he just walked around.

Several financial investigators and officers from the Suffolk district attorney's office, the Department of Public Safety, the Boston police department, and the commission testified that on various occasions they had questioned Patrick, George E., and George J. about the ownership of the lounge and had been told by George J. that his father had recently purchased the lounge, that he (George J.) was the "owner" but only his attorney could supply information as to why his name did not appear on the records filed in the State Secretary's office. The investigators were informed by George E. Tecci that he had "taken over" the lounge, that it was "his place" but that "the records don't reflect that." Patrick indicated to the investigators that he was previously employed by the city of Boston and had an interest only in a barbershop and a restaurant in Cambridge, and did not mention his interest in the lounge. Patrick also admitted in testimony that

his brother-in-law George J. Tecci was the "treasurer."[16]

Against this background, Patrick and Margaret Vidette filed renewal applications in 1974 and 1975 with the board, swearing in the applications under the penalties of perjury that no person or persons other than the two of them held a "direct or indirect interest" in the license, that Patrick alone was "the Treasurer"[17] and, in the 1974 renewal application, that there had been "no pledge of the capital stock" of the corporation.[18]

The commission, based on this evidence, concluded that Patrick had been effectively excluded from managerial control, that George E. and Catherine Tecci in fact held an indirect beneficial interest in the lounge, that Patrick was used as a "straw" to evade the revelation of the Teccis' involvement, that Patrick acted under the control of the Teccis and subject to their instructions, and that as a result false statements had been knowingly made on the various transfer and renewal applications filed with the board.

1. The plaintiff asks us to enlarge the traditional scope of review prescribed by the substantial evidence standard for the evaluation of agency decisions since it maintains that the commission's findings were adopted nearly verbatim from a set of proposed findings submitted to the commission by the district attorney.[19] When this occurs,

---

[16] George J. denied that he was the treasurer, and the lounge attempted to reconcile the inconsistency by contending that it may have had two treasurers.

[17] Within three weeks of representing these facts to the board in the 1975 renewal application, the lounge caused to be filed with its bank through Patrick and Margaret an additional certification that George J. was the treasurer.

[18] By the time the 1975 renewal application was filed the note to Aucella had been paid and the pledge of stock accompanying the note had been extinguished.

[19] As a basis for this contention the plaintiff points to several Federal circuit cases which have been critical of a trial judge's wholesale adoption of one counsel's proposed findings of fact submitted to the judge under the Federal equivalent of Mass. R.Civ. P. 52(a), 365 Mass.

the plaintiff argues, we should look especially closely to be sure that the commission's findings have evidentiary support in the record. If this route is taken, the plaintiff indicates that it will become apparent to us that its activities constituted lawful business conduct and that in substance Patrick is the sole owner of the corporation's stock and actually indebted to his father and mother-in-law for the payment of loans made by them to him. Facing a sisyphean task in establishing this proposition in view of the evidence, the plaintiff proceeds to urge also that any statements by family members in the form of admissions to the contrary should be cast aside as "fragments" of the record, and as the product of an "unsophisticated, non-legal" definition of ownership "in the eyes of the Teccis."

In our view this amounts to an argument that we should make independent findings on our own initiative from the record more in accordance with the plaintiff's theory of the case in place of making a determination as to whether substantial evidence exists to support the commission's findings. "A court may not displace an administrative [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Labor Relations Commn.* v. *University Hospital, Inc.*, 359 Mass. 516, 521 (1971). *School Comm. of Chicopee* v. *Mass. Commn. Against Discrimination*, 361 Mass. 352, 354 (1972). *Bartlett* v. *Contributory Retirement Appeal Bd.*, 6 Mass. App. Ct. 948 (1978). The agency is the sole judge of the credibility and weight of evidence before it during the administrative proceeding. *Maddocks* v. *Contributory Retirement Appeal Bd.*, 369 Mass. 488, 495

816 (1974). See *Dreyfus & Cie.* v. *Panama Canal Co.*, 298 F.2d 733, 737 (5th Cir. 1962); *Roberts* v. *Ross*, 344 F.2d 747 (3d Cir. 1965); *In re Las Colinas, Inc.*, 426 F.2d 1005, 1010 (1st Cir. 1970), cert. denied, 405 U.S. 1067 (1972); *Flowers* v. *Crouch-Walker Corp.*, 552 F.2d 1277, 1284 (7th Cir. 1977). But in all of these cases, the findings were viewed in the context of the clearly erroneous standard imposed by rule 52(a), irrespective of their source.

(1976). We are satisfied that the commission's findings were amply supported by the evidence before it, that the Teccis under the guise of a closely held corporation effectively controlled the lounge to the exclusion of Patrick, and that the Teccis acted in a much more substantive role than that of creditors or high level management. The commission was not bound to accept the intra-family transactions at face value, and it could determine from the considerable direct and circumstantial evidence before it that the real indicia of ownership pointed to the Teccis as the persons in control of the lounge since they advanced the money for its acquisition, ran it on a day-to-day basis, and drew the bulk of the funds it produced.

2. The plaintiff also contends that the commission misinterpreted the meaning of the phrase "indirect interest in this license" as it appears on the board's forms, requiring disclosure of such interests, by construing that term to embrace the interests possessed by the Teccis as creditors or as management employees. The argument proceeds on the basis that the word "interest" must be read to encompass only such interests as are possessed by the owners of the corporation's stock.[20] Put another way, the plaintiff maintains that the record owner of the capital stock and the officers and directors of the corporation are the only persons that can have a direct or indirect interest in the corporation. We do not think it is appropriate in this context to mold the term "indirect interest" into the rigid definition suggested by the plaintiff.

The concept of an ownership interest can vary from an absolute proprietary interest to a mere possessory right. See *Animal Rescue League* v. *Assessors of Bourne,* 310 Mass. 330, 333 (1941); *Northgate Constr. Co.* v. *State Tax Commn.,* 377 Mass. 205, 208 (1979). But the concept can

---

[20] It appears that no attack was ever made before the board, the commission, or the court as to the validity of the requirement that indirect interests in a license be disclosed or as to the validity of rule nine of the commission. We do not in any way intimate that such an attack would be successful.

also have other meanings between these two poles. The commission viewed the term "indirect interest," on the facts before it, as a concept reasonably similar to that reflected by the possession of a beneficial interest in, or control over, property, and recognized that in attempting to ascertain the identity of the persons who in effect control a corporation and its assets the fact finder must of necessity pierce labels, look beyond form, and come to grips with the substance of the corporate relationship and the economic realities that are present. The commission applied the concept as embracing interests that are possessed "in the broad or equitable sense rather than in the narrow or technical sense," *Grand Union Co.* v. *Sills*, 43 N.J. 390, 408-409 (1964), and concluded, we think rightly, that a straw titleholder can be used to obfuscate the beneficial interests of others.

The commission's methodology in assessing the term "indirect interest" is also supported by the analysis in the decisions that have construed the requirements of G. L. c. 138, § 15. The provisions of that statute limit a person or a combination of persons from directly or indirectly holding more than three package store licenses. In approaching the problem whether a combination of persons holds a license the decisions under the statute have followed a path similar to the one tramped by the commission in this matter by looking to the substance of the ownership interests involved apart from the form employed to hold title. Thus, the decisions have stated on the topic of license control that such factors as "[i]nterlocking stockholders, directors and officers, *family relationships, guidance, assistance and financial support*, and joint activities" (emphasis supplied) are relevant criteria to be considered. *Powers* v. *Sixty Broadway, Inc.*, 371 Mass. 296, 300 (1976). See also *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 348-350 (1964); *Johnson* v. *Martignetti*, 374 Mass. 784 (1978). The principles set forth in these decisions are analogically supportive of the commission's unraveling of the identity of the persons involved with the

license under consideration here. The commission could properly find that the phrase "indirect interest" means an "indirect beneficial interest," see *Johnson* v. *Martignetti, supra* at 789, and that the Teccis held such an interest, so as to require disclosure. Nor does the record support the plaintiff's argument that the commission erroneously blurred the distinction between stock ownership and managerial authority.

Finally, on this question, the commission's application of the term has to be viewed also in light of the fact that businesses selling intoxicating liquors are heavily regulated. *Ziffrin, Inc.* v. *Reeves*, 308 U.S. 132, 138 (1939). *Connolly* v. *Alcoholic Beverages Control Commn.*, 334 Mass. 613, 619 (1956). *Arno* v. *Alcoholic Beverages Control Commn.*, 377 Mass. 83, 85-86 (1979). Because of this the licensing authorities have the legitimate right to expect full disclosure of holdings in the nature of substantial indirect as well as direct beneficial interests in an entity which seeks to own a license, particularly where specific inquiry is made on the issue, so that the agencies will be able properly to discharge their obligations of ensuring that the applicant meets the requirements imposed upon a prospective licensee. We are not prepared to say that the commission, based on the evidence before it and the facts it found, made an error of law in its interpretation and application of the term in this case.

3. On a last point we do not find that the remedy imposed by the commission was "draconian" under all the circumstances. Section 64 of G. L. c. 138 specifically authorizes the commission to revoke a license if it finds that a licensee has violated a commission regulation. An agency sanction requires the exercise of a certain amount of discretion, *Wright* v. *Health Commr. of Boston*, 322 Mass. 535, 540 (1948); *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Commn.*, 372 Mass. 152, 154-155 (1977), which is open to challenge only if that discretion is seriously abused. The commission explained in detail the importance of rule nine and the importance of the com-

mission's need to receive truthful information about interests involved directly or indirectly in the control of a liquor license. In this case the purpose of masquerading the ownership interest in the lounge was to induce the agencies to take a course of action that had been previously rejected. The commission based its sanction on the findings of deliberate deception on the part of the plaintiff and the conclusion that the deception struck at the root of the obligations imposed on the board and the commission to regulate the ownership of licenses. It cannot be said that "the remedy selected has no reasonable relation to the unlawful practices found to exist." *Jacob Siegel Co.* v. *F.T.C.*, 327 U.S. 608, 613 (1946). On the record we rule that there was no abuse of discretion as to the sanction imposed, and that its use was amply supported by the facts pointing to purposeful violations of the commission's regulation with regard to the contents of the forms filed with the board.

*Judgment affirmed.*