Hines, J.
Introduction
The Licensing Board for the City of Boston (“Board”) and Lower Washington Street Task Force[1] (“Task Force”) have brought these administrative appeals pursuant to G.L.c. 30A, §14. They challenge the decision of the Alcoholic Beverages Control Commission (“Commission”) to grant Oznemoc, Inc.’s (“Oznemoc”) petitions to: a) adopt a management agreement with 320 Advisors, Inc. (“Advisors”); b) transfer 10% of its stock to William Deyesso (“Deyesso”); c) change the manager of its business known as ‘The Naked I” from Geoffrey Horowitz (“Horowitz”) to Steven Hurd (“Hurd”); and d) change the name of the business from “The Naked I” to “Centerfolds.” In accordance with the procedure required under Superior Court Standing Order 1-96, both plaintiffs have filed a motion for judgment on the pleadings. For the reasons set forth below, the motions are DENIED.
BACKGROUND
The factual record on which the Commission relied in reversing the Board’s denial of Oznemoc’s petitions includes the proposed management agreement (“Agreement”), affidavits submitted by Deyesso, Hurd and Horowitz and the transcript of the Board hearing. At that hearing, interested parties testified in favor of and in opposition to the petitions. The procedural history of this case and a summary of the evidence before the Commission are set forth below.
Oznemoc is licensed to do business under the name of “The Naked I,” which operates a club at 12-18 LaGrange Street in downtown Boston. The particular business of “The Naked I” is adult entertainment, *778 including nude dancing and the sale of liquor by the drink. Horowitz was Oznemoc’s sole shareholder in October 2000 when he proposed to transfer a 10% interest in the business to Deyesso in return for a payment of $25,000. As the owner of a 10% interest, Deyesso would then assume the title of Vice President of Oznemoc. Deyesso also pledged at least $250,000 for improvements and renovations to the club premises.
On October 11, 2000, concurrent with the proposal to transfer shares to Deyesso, Oznemoc entered into the Agreement with Advisors, an entity in which Deyesso owns a 50% share. It is this Agreement between Oznemoc and Advisors which lies at the heart of this dispute. The Agreement contains a curious mix of rights and duties suggesting both Oznemoc’s primacy over and subservience to Advisors. Consistent with Oznemoc’s primacy, the Agreement provides in part that: 1) Advisors shall consult with Oznemoc on management and operations; 2) the Agreement is effective for a time certain and Oznemoc may terminate the agreement under certain conditions; 3) Oznemoc can expand the scope of the business; 4) employees hired by Advisors are Oznemoc employees; 5) Advisors operates the business and pays Oznemoc a set fee for that privilege; 6) Oznemoc retains its status as the employer of record for all persons hired by Advisors to staff the day to day operations of the business; and 7) Oznemoc accepts full financial responsibility for wages, taxes and employee benefits.
On the other hand, the Agreement also contains provisions suggesting Oznemoc’s subservience. In that regard, the Agreement provides that: 1) Advisors is granted complete discretion in the day-to-day management and operation of the business; 2) Advisors is granted the authority to hire and fire employees; 3) Advisors is granted the authority to enter into contracts necessary to the operation of the business and to pay business obligations; 4) Oznemoc may not terminate the Agreement for 15 years except in limited circumstances where Advisors engages in gross negligence or willful or wanton misconduct likely to cause a revocation of the license; 5) Advisors has the right to share in the revenue and profits; 6) Oznemoc cannot assign the Agreement without Advisors’ consent; and 7) Advisors guarantees to Oznemoc payment of $8,000 per week for a period of six months, for a total amount of $208,000 as a “minimum return on investment.”
After finalizing this Agreement with Advisors, Oznemoc filed its petitions with the Board on October 16, 2000. The petitions sought approval of: (1) a transfer of 10% of Oznemoc stock to Deyesso; (2) the Agreement between Oznemoc and Advisors for the management of the business; and (3) a change in the designated manager from Horowitz to Hurd. The required public notice of the petitions generated intense opposition from Chinatown and the surrounding communities. The Board held the first of two hearings on Oznemoc’s petitions on November 8, 2000 when it received testimony that Oznemoc had failed to meet with the community or to explain its plans. The Board then deferred a decision until November 30, 2000 to allow Oznemoc to meet with the community and to facilitate further public comment on the petitions. On November 30, 2000, the Board voted to hold a second hearing which was held on December 7, 2000. At this hearing, individuals representing the Chinatown community,[2] Chinatown residents,[3] elected officials[4] and public safety officials[5] testified before the Board. The public comments were unanimous in opposition to the petitions. In general, those persons opposing the petitions expressed concern that the particular type of adult entertainment, nude dancing, offered at the club would adversely affect the quality of life for those living and working in and near the Chinatown neighborhood. In addition, several witnesses questioned Deyesso’s character and fitness to participate in the ownership and management of the club.
In the legal arguments to the Board, counsel for Task Force argued that the transactions between Oznemoc, Deyesso and Advisors amounted to a license transfer to Deyesso and that the transfer was not in the public interest because of its impact on the Chinatown neighborhood. Counsel for Oznemoc countered that 1) the Agreement represented nothing more than a transfer of management responsibilities; 2) Deyesso possessed the requisite qualifications to hold an interest in the license; and 3) Hurd was qualified for the appointment as manager of record. A week later, on December 13, 2000, the Board voted to reject Oznemoc’s petitions on the grounds urged by the Task Force.
On December 14, 2000, Oznemoc exercised its right of appeal to the Commission. The issues submitted to the Commission were as follows: 1) whether or not the Agreement between Oznemoc and Advisors constitutes a transfer of the license to Advisors; 2) whether Deyesso is of sufficiently good character to hold an interest in a liquor license as required by G.L.c. 138, §12; 3) whether Steven Hurd possesses the requisite good character to be the licensed manager for the license; and 4) whether the licensee can do business under the name of Centerfolds.[6] The Commission held an appeal hearing on March 13,2001. At that hearing, the Commission heard testimony from Hurd only and it adopted the transcript of the Board hearing as part of the appeal record.
On April 13, 2001, the Commission issued its decision (“Decision”) reversing the Board’s denial of Oznemoc’s petitions. The Commission determined that while the Agreement transfers a beneficial interest in the license to Advisors and Deyesso, it does not constitute an outright transfer of the license to Advi-sors and that even if a transfer occurred, the transactions met the statutory public good requirement. As to Deyesso’s ownership of a 10% interest in Oznemoc, *779 the Commission concluded that the record evidence supported a finding that Deyesso possessed the requisite character to own an interest in the license. Likewise, the Commission decided that the record evidence supported a finding that Hurd possessed the necessary qualifications for his appointment as manager for Oznemoc. Finally, the Commission found no impediment to Oznemoc’s use of the name “Centerfolds.” Thereafter, the plaintiffs filed these appeals pursuant to G.L.c. 30A.
DISCUSSION
1. Standard of Review
The scope of review of the Commission’s decision is defined by G.L.c. 30A, §14(7), which provides in pertinent part that an administrative agency’s decision may be set aside if, as plaintiffs allege here, “the substantial rights of any party may have been prejudiced because the agency decision is . . . based upon an error of law; or . . . unsupported by substantial evidence.” The reviewing court must limit its review to the administrative record and give due deference to the “experience, technical competence and specialized knowledge of the agency,” in considering the merits of the appeal. G.L.c. 30A, §14(7). See Flint v. Comm'r. of Pub. Welfare, 412 Mass. 416, 420 (1992).
In reviewing an appeal on the ground that the agency decision is unsupported by substantial evidence, “this court is not authorized to make de novo determinations of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [Commission].” Doherty v. Ret. Bd. of Medford, 425 Mass. 130, 141 (1997). Simply stated, the reviewing court may not substitute its judgment for that of the agency. S.Worcester County Reg’l Vocational Sch. Dist. v. Labor Relations Comm., 386 Mass. 414, 420-21 (1982) (citation omitted). At the same time, a court is not required to affirm the agency merely on a finding that the record contains some evidence from which a rational mind might draw the desired inference. Rather, the Court is to probe whether the evidence points to an appreciable probability of the conclusion arrived at by the Commission. New Boston Garden Corp. v. Assessors of Boston, 383 Mass. 456, 456 (1981). If the substantial evidence test is met, a court must affirm the agency’s action even if the court in reviewing the same evidence would reach a different result. Seagram Distillers Co. v. Alcoholic Beverages Control Comm’n, 401 Mass. 713, 721 (1988).
Where the appeal is based on a claimed error of law, the issue is reviewed de novo. Belhumeur v. Labor Rels. Comm’n., 432 Mass. 458, 463 (2000); SEIU, AFL-CIO, Local 509 v. Labor Rels. Comm’n, 431 Mass. 710, 713 (2000). The deference normally accorded to an agency decision on factual issues is not appropriate in reviewing questions of law. Boston Police Superior Officers Fed’n v. Labor Relations Comm’n., 410 Mass. 890, 892 (1991).
Applying these standards, I consider the plaintiffs’ challenge to the Commission’s Decision.[7] The burden is on the plaintiffs, as the moving parties, to establish that the agency’s decision is invalid on one or more of the grounds alleged. Bankers Life and Cas. Co. v. Comm’r of Insurance, 427 Mass. 136, 138-39 (1998); Bagely v. Contributory Ret. Appeal Bd., 397 Mass. 255, 258 (1986). The plaintiffs raise the following issues on this appeal: A) whether the Commission erred as a matter of law in concluding that the Agreement and related transactions did not constitute a transfer of Oznemoc’s liquor license; B) whether the Commission properly determined that the public neecl and common good requirements of G.L.c. 138 were met in allowing Oznemoc’s petitions; C) whether the Commission’s finding that Deyesso’s felony conviction does not disqualify him from owning an interest in a license was based on substantial evidence; D) whether the Commission improperly limited the Task Force’s participation in the proceedings; E) whether the Commission’s decision that Steven Hurd is qualified for the appointment as manager of Oznemoc was supported by substantial evidence; and F) whether the Commission erred in allowing the change of name to “Centerfolds.” I address each of these arguments in turn.
2. The Commission’s Decision on the License Transfer Claim
Plaintiffs argue that the interrelated October 2000 transactions between Oznemoc, Deyesso and Advisors constituted a defacto sale or transfer of Oznemoc’s liquor license to Deyesso and Advisors and that the Commission’s decision to the contrary is based on an error of law. They contend that the new ownership structure created by Deyesso’s purchase of a 10% share of Oznemoc taken together with the Agreement permitting Deyesso and Advisors to control Oznemoc’s operations and to share in all of its revenue from the sale of alcoholic beverages compelled a finding that a license transfer had occurred. Plaintiffs press the point because a “transfer” of a liquor license triggers the “public interest” inquiry pursuant to G.L.c. 138, §23, para. 9.[8] If there is no transfer, neither the Board nor the Commission is obligated to consider the “public interest” concerns which plaintiffs allege justify the denial of the license transfer in this case.
The well-settled rule is that a transfer of a license occurs “when there is a sale of a liquor business and the license is inseparable from the purchase price.” Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass.App.Ct. 162, 174 (1997) (citations omitted). The license is inseparable from the purchase price when the transfer is held out as an inducement and its value is part of the sale price. Kennedy v. Welch, 196 Mass. 592, 595 (1907). A transfer of a liquor business takes place “when the person introduced to it runs the business for his own account.” Griffin’s Brant Rock Package Store, Inc. v. Alcoholic Beverages Control Comm’n, 12 Mass.App.Ct. 768, 771 (1981). Implicit in *780 a transfer of a liquor business is the surrender of control. Id. at 771. Entrusting management responsibilities to others is not regarded as a license transfer. Id. at 772. Moreover, evidence reflecting a high level of cooperation between the liquor licensee and other licensees and entities which the licensee controlled is insufficient to support a conclusion that licensee had made a transfer of its license. See Id. at 773.
Given the relevant legal principles, the analysis of plaintiffs’ claims involves two questions: 1) whether there was a sale, that is, a surrender of control of the business to Deyesso and Advisors; and 2) if so, whether the transfer of ownership of the license was an integral part of that transaction. Though plaintiffs urge an examination of all of the transactions, including the transfer of a 10% interest in Oznemoc to Deyesso and the proposed management agreement with Advisors, an entity in which Deyesso held a 50% share, the analysis turns in the first instance on the interpretation of the Agreement which governs and defines the relationship between Oznemoc and Advi-sors. The Commission was entitled to take the Agreement at face value inasmuch as no person or interested party presented evidence sufficient to establish that the Agreement itself was a sham.
Looking at the Agreement in its entirety, the Commission determined that the Agreement represented only a delegation of management responsibilities to Advisors and that there was no transfer because “Oznemoc, Inc. retains more than sufficient control of the licensed premises.” See Griffin’s Brant Rock Package Store, Inc., 12 Mass.App.Ct. at 771-72. I am persuaded that this finding is supported by substantial evidence and that it is correct as a matter of law.
Recognizing that control is the touchstone for a transfer, the Commission highlighted those provisions of the Agreement which, in its view, manifested Oznemoc’s control over the business:
1. The Agreement has a final date of termination, a renewal provision, and, then a further final termination period.
2. The aforesaid termination period can happen earlier if the employees and/or agents of 320 act in a grossly negligent or willful or wanton manner which may give rise to the revocation of any license. Sec. 2.
3. 320 ‘shall’ consult on a regular basis with Oznemoc regarding the overall management and operations. Sec. 3.10 [sic].
4. Oznemoc can increase the amenities, services or expand the scope of the business. Sec. 3.01.
5. The employees shall be those of Oznemoc and not 320. Sec. 3.01(a).
6. Oznemoc shall pay all employee wages, state and federal payroll taxes, social security, unemployment taxes, workman’s compensation and “other taxes.” Sec. 3.01.
7. Oznemoc shall be responsible for all claims by employees . based upon workman’s compensation, ERISA, employment discrimination and/or harassment, labor generally or otherwise arising at law or in equity or by reason of any federal, state or local statute or regulation." Sec. 3.10(a) [sic].
8. Oznemoc mandates that 320 comply with all federal, state, county and local liquor control laws and specifically instructs 320’s conduct as it relates to any fire insurance policies. Sec. 3.02.
9. All monies received by 320 in the conduct of the business are to be deposited in an Operating Account which is to be the “property” of Oznemoc. Sec. 3.03.
10. 320 Advisors is mandated by the specific designation of expenses to be paid from the Operating Account including lease payments, insurance policies, repairs, equipment, furniture, kitchen ware, compliance fees, attorneys fees, etc. Sec. 3.04.
11. The payroll account is to be funded by the Operating Account, or if necessary, by Oznemoc. Sec. 3.05.
12. All expenses covered in the Agreement, and they are prolific, are mandated to be paid by 320.
13. 320 is not obligated to advance its own funds for working capital. Sec. 3.07.
14. 320 “shall” protect and promote Oznemoc’s interests in all respects. Sec. 3.08.
15. 320 shall “conduct its operations to the greatest advantage of Oznemoc and will keep Oznemoc informed as to ail [emphasis supplied] matters concerning the Business.” Sec. 3.08.
16. Oznemoc shall have full [emphasis supplied] access to the premises at all times. Sec. 3.08.
17. 320 cannot pledge the credit of Oznemoc nor commit Oznemoc in their name. Sec. 3.09.
18. 320 Advisors shall not borrow money or sign any promissory note or give any financial guarantee on behalf of Oznemoc. Sec. 3.09.
19. On or before the 10th day of each month 320 shall submit a Profit and Loss Statement pursuant to generally accepted accounting principles to Oznemoc.
20. Oznemoc can, at its own election, choose to sell the business and/or a majority of its stock. Sec. 8.
Taken together, these provisions of the Agreement clearly cast Advisors in a subservient role to Oznemoc. In particular, the Commission could find that those provisions of the Agreement recognizing Oznemoc’s 1) obligation to capitalize the business (Section 3.07), 2) right to terminate the agreement if Advisors fails to accomplish the purposes of the management agreement, i.e., generate the agreed upon revenues (Section 5), and 3) right to sell the business (Section 8), trump those provisions that might otherwise suggest Oznemoc’s subservience to Advisors. Following the *781 rule in Griffin’s Brant Rock Package Store, Inc., 12 Mass.App.Ct. at 771-72, the Commission correctly determined Advisors’ interest was limited such that it would not be running the business for “its own account” but for Oznemoc’s benefit.
Apart from an interpretation of the Agreement, the facts in this case are totally different from those cases where the court has found a transfer. A court is justified in finding a transfer where the purported principal contributed no financial resources and was wholly dependent on another who was disqualified from applying for the license. Cleary v. Cardullo’s Inc., 347 Mass. 337 (1964). Likewise, a transfer is effected when a person substitutes himself as the “straw titleholder” for the purpose of securing a license for the benefit of one who is otherwise denied the right to the license. Number Three Lounge, Inc., v. Alcoholic Beverages Control Commission, 7 Mass.App.Ct. 301, 311 (1979). Though the plaintiffs suspected that Horowitz was a straw for Deyesso, no evidence presented to the Commission established this fact. Given the state of the evidence, the Commission and this Court are bound to interpret the Agreement by its terms rather than indulge in speculation about the true intent of the parties. That Agreement, through its twists and turns, vests ultimate control of the license in Oznemoc.
Looking at the same agreement, Plaintiffs argue that certain provisions, taken together with the transfer of shares to Deyesso, vest control in Advisors and constitute a license transfer under Massachusetts law:[9]
Section 3.01 320 Advisors has complete discretion in the day-to-day management and operation of the business, with the limited qualification that it shall consult with Oznemoc on a regular basis as to overall management and operations. 320 Advisors is authorized to employ, pay, establish and change rates of pay and supervise, train and discharge all employees and personnel of the business. 320 Ad-visors is authorized to determine and carry out the business’ labor policies, though employees hired by 320 advisors are employees of Oznemoc, subject to 320 Advisors’s sole discretion and control. 320 Advisors shall enter into bona fide contracts required in their discretion in the ordinary course of business including contracts for entertainment, utilities, food, liquor, security, etc.
Section 3.03 Operator will deposit all funds received from business operations into a bank account (the “Operating Account’) which is maintained jointly by Oznemoc and 320 Advisors.
Section 3.04 320 Advisors is authorized to pay from Operating Account, without Oznemoc’s prior approval, all payments, terms, covenants, conditions, and obligations made by the business under any agreement with respect to the business and to maintain all permits and licenses required to operate the business.
Sections 4.01, 4.02 320 Advisors shall receive a monthly management fee of at least 10% of the monthly gross revenue and an additional payment when it exceeds monthly payment targets.
Section 7.01 320 Advisors guarantees that it shall distribute and OZNEMOC shall receive, upon the commencement of operations, the sum of eight thousand dollars ($8,000.00) per week for a period of six months.
Section 8 320 Advisors has a right of first refusal in the event that Oznemoc elects to sell the business or a majority of its stock.
Section 9.01 Neither party shall have the right to make any . . . assignment of this Agreement or any interest herein without the written consent of the other.
Plaintiffs argue that the duties set forth in these provisions are responsibilities typically exercised by an “owner” of a liquor business. That may be true. However, plaintiffs do not suggest that these duties are the exclusive province of ownership. Nor do they assert that the transfer of these responsibilities is necessarily synonymous with control. Indeed, the Commission could find based on its expertise that management agreements of one type or another are common to the industry. The record is devoid of any evidence that the Agreement in this case is inconsistent with generally accepted industry standards.
The plaintiffs also argue that the delegation of the responsibility for day to day management of the business as set forth in Section 3.01 of the Agreement vested control in Advisors. The Commission, based on its expertise and experience, could conclude that the delegation of responsibility for the day-to-day operations of a liquor business is consistent with industry custom. The Commission could also find that the desire to shift the burden for the day to day operations of a liquor business is the raison d'etre of such agreements. Finally, this particular provision of the Agreement cannot be viewed in isolation from other provisions which restrict Advisors’ control over Oznemoc.
Advisors’ rights and responsibilities with respect to the Oznemoc’s operating account as provided in Sections 3.03 and 3.04 of the Agreement are as likely related to convenience in performing the management duties as to Advisors’ ultimate control of the business’ finances. Oznemoc remains a signatory to the account. There was no evidence before the Commission suggesting that Oznemoc shared ownership of the account in name only.
Advisors’ right to a share of the gross revenues as provided in Sections 4.01 and 4.02 is a more troublesome fact to reconcile with a mere management relationship. In this regard, plaintiffs cite Hastings for the *782 proposition that a transfer occurs when “part of the consideration paid . . . was a percentage of profits derived from the gross sales of alcoholic beverages above a certain threshold.” Hastings, 42 Mass.App.Ct. at 174-75. In Hastings, the parties did not dispute that the license was transferred. Indeed, the evidence was that the parties colluded to devise an elaborate scheme to conceal the transfer from the licensing authority. The issue of what constituted a transfer was not before the court. The reference in Hastings to the profit-sharing arrangement between the parties, therefore, was in no sense a litmus test for the transfer. A compensation scheme which relies on performance-based incentives is more consistent with a managerial relationship. However, it requires a quantum leap of logic to conclude that compensation based on gross revenues is necessarily synonymous with Advisors’ control or ownership, especially in view of the checks and balances inherent in the Agreement. The Commission, using its expertise and experience and taking into account the Agreement as a whole, could properly conclude that this provision did not vest control in Advisors.
Advisors’ promise to pay Oznemoc the sum of $6000 per week for a period of six months as a “minimum return on investment” as provided in Section 7.01 of the Agreement likewise is susceptible to interpretation as consideration for the sale of a liquor business. When such a guarantee is given, the owner receives an amount certain rather than an amount that is related to actual revenue. By contrast, the iypical management agreement might limit the owner’s income to actual profits. The inclusion of a provision that facilitates payment for a license transfer under the guise of payment of “fees” to the owner of the license provokes a “prudent suspicion” that the transaction is not simply a management agreement. However, the Commission could reasonably interpret the guaranteed payment provision as representing the parties’ attempt to insure that Oznemoc’s income stream was not interrupted during the initial phase of the Agreement. Protection from the loss of income is a legitimate business concern of a licensee entering into a management agreement. Again, this provision cannot be judged in a vacuum but only in the context of the entirety of the Agreement. The Commission acted within its authority and consistent with its expertise and experience in giving effect to the parties’ apparent intent.
Advisors’ right of first refusal on the sale of the business is not synonymous with control. Oznemoc’s grant of a right of first refusal to Advisors does not restrict absolutely its right to sell the business. Indeed, Oznemoc retains the right to secure the best price for the business from any qualified buyer. It simply agrees to allow Advi-sors to come forward with a matching offer, which if unmatched allows Oznemoc to sell to others at its option.
To be sure, the provisions of the Agreement highlighted by the plaintiffs represent significant restrictions on rights that otherwise would be enjoyed by one claiming ownership. However, the right to delegate the duties and responsibilities of the business is a prerogative of ownership. An owner who seeks to retain his license may delegate rights and responsibilities so long as he retains ultimate control of the enterprise. Oznemoc’s control as manifested in the Agreement is not compromised by either the transfer of a 10% interest to Deyesso or by Deyesso’s 50% share in Advisors.
Finally, plaintiffs criticize the Commission’s reliance on Griffin’s to support its ruling on the transfer issue. I agree that the two cases are not precisely analogous. The facts of this case are markedly different from those in Griffin’s which involved, as far as the record showed, only the benevolent intervention of others. Unlike the circumstances of this case, there was no evidence in Griffin’s that the owners transferred any part of the business assets to the managers. Nor was there evidence of an elaborate compensation schedule that might grant the managers access to the profits of the business. Finally, there was nothing in Griffin’s to show that the owners had contractually surrendered the right to manage and oversee the day-to-day operations of the business. Lacking evidence of anything more than a managerial relationship, the court in Griffin’s predictably held that no license transfer occurred. In this case, Oznemoc clearly surrendered to Advisors far greater authority for running the business than was at issue in Griffin’s. However, as discussed above, the Commission correctly followed the analytical approach dictated by Griffin’s when it decided that ultimate control rests with Oznemoc.
In rejecting the plaintiffs’ appeal, I do not discount the reasonableness of the “prudent suspicion” that attends the relationship between and among Oznemoc, Deyesso and Advisors. However, “suspicions are an insufficient basis” for this Court’s conclusion that a license transfer has occurred. Griffin’s at 773. Without some concrete basis on which to verify the plaintiffs “prudent suspicion,” I cannot disturb the Commission’s findings on this issue.
3. The Commission’s Public Interest D eter mination
Plaintiffs argue that because the October 2000 transactions constituted a transfer of Oznemoc’s liquor license, the Commission was statutorily obligated to consider whether the transfer is in the “public interest” and that the Commission erred in deciding that Oznemoc’s petitions met the “public interest" test set forth in G.L.c. 138, §23, para. 9.[10] As to the first point, the Task Force complains that the Commission incorrectly asserted that it was considering the public interest issue sua sponte because, according to the Task Force, whether the transfer was in the public interest was directly at issue in the appeal. However, it is clear that the public interest inquiry is mandatory only if the underlying transaction is a license transfer. The Commission’s decision that the disputed transactions did not constitute a transfer rendered the public interest issue moot, relieving the Commission of any obligation to consider the matter. Perhaps the Com *783 mission could have chosen more precise language to explain why it was even addressing the issue. Even so, the Commission could properly decide to explain its view of the public interest issue rather than dismiss without comment the groundswell of community concerns expressed at the Board hearing. The Commission acted within its discretion to acknowledge the considerable testimony describing the impact of the adult entertainment on Chinatown and the surrounding community. Though not necessary, the Commission could explain how it valued the licensee’s constitutional right to offer nude dancing in its assessment of the public interest. Because there was no license transfer, neither the Commission’s motivation nor its ultimate conclusion on the issue is relevant to this appeal. Therefore, I find no basis to disturb the Commission’s decision on this issue.
4.Deyesso’s Fitness to Own an Interest in the Licensed Premises
Plaintiffs contend that Deyesso’s felony conviction and his prior business dealings with the city of Boston in relation to his ownership of other licensed premises demonstrated that Deyesso lacked the requisite character to hold a 10% interest in Oznemoc and that the Commission’s decision to the contrary is not supported by substantial evidence. The issue of Deyesso’s character arises in the context of G.L.c. 138, §12[11] which provides that: “Before issuing a license to any applicant... under this section ... the local licensing authority shall cause an examination to be made ... to determine ... that the applicant is ... a person of good character.”
On the matter of Deyesso’s character and fitness to own an interest in Oznemoc’s license the Commission found that:
[W]hen Mr. Deyesso’s total character is taken into consideration, he meets the requirements of M.G.L.c. 138. Some of those considerations are:
a. his admitting to the wrongdoing in 1994;[12]
b. his otherwise clean criminal record;
c. his legally and successfully managing all of his business interests;
d. his facing all of his accusers;
e. the many recommendations as to his good character; and
f. his prolific involvement in many civic and charitable endeavors.
This Court must review the record to determine whether these findings are supported by substantial evidence. Other than Deyesso’s admitted felony conviction, the evidence before the Commission on the character issue was based primarily on hearsay and opinion. In reviewing such evidence, the determination of credibility was within the Commission’s discretion. Vinal v. C.R.A.B., 13 Mass.App.Ct. 85, 101 (1982). One witness accused Deyesso of playing an “elaborate shell game”on the control of the Oznemoc. However, this witness offered only his opinion, without any supporting facts, that Deyesso indeed controlled Oznemoc. This same witness referenced what he referred to as Deyesso’s business practices[13] in the North End while expressly declining to address himself to the issue of Deyesso’s character. Though Deyesso’s addressed the Board’s concerns about his connections to certain individuals in his testimony, he denied any connection between these individuals and Oznemoc. He also denied any involvement with these individuals in any illegitimate activily. No credible evidence disputing Deyesso’s testimony was presented to the Commission.
The Commission rejected the hearsay allegations and instead, found the substantial documentation from various organizations and elected officials that Mr. Deyesso was a “good citizen” on account of his charitable activities more compelling. The Commission also noted its previous consideration of the felony conviction in 1999 when it found Deyesso fit to hold a license. Finally, the Commission considered the undisputed fact that Deyesso had no other convictions on his record since 1999.
Plaintiffs are correct that a felony conviction may disqualify one from taking an ownership interest in a liquor license. Under G.L.c. 138, §12, a license may not be issued to “any applicant who has been convicted of a violation of federal or state narcotics drugs laws.” However, a felony conviction on some other charge is not conclusive on the character issue. Of course, Deyesso’s conviction was unrelated to narcotics violations. Moreover, the prohibition on the issuance of licenses in this narrow class of convictions necessarily means that persons convicted of other offenses are not automatically disqualified from holding an interest in a liquor license. Plaintiffs cite no cases holding otherwise. The Commission reviewed the record before it and provided detailed and particularized findings as to Deyesso’s fitness. There being substantial evidence to support this conclusion, this Court will not disturb these findings.
5.Exclusion of the Task Force from the Proceedings
The Task Force argues that the Commission’s Decision should be vacated because its motion to intervene to present relevant evidence on the public interest issue was not timely considered by the Commission. Inasmuch as I have concluded that no license transfer occurred, the public interest issue was not relevant or important to the Commission’s resolution of the issues. Taking this view of the case, I conclude that the Task Force suffered no harm by the Commission’s action and that an order vacating the Commission’s Decision on this ground would be inappropriate.
6.Petition for Change of Manager from Horowitz to Hurd
Pursuant to G.L.c. 138, §26, no license shall be granted to a corporation unless the person designated *784 as manager of the establishment “is, with respect to his character, satisfactory to the licensing authority.” In its Decision, the Commission reversed the Board’s determination that Hurd lacked the requisite character to serve as Oznemoc’s designated manager. The Commission expressly rejected the Board’s determination that Hurd was unfit because of his affiliation with Dollhouses of America, an entertainment entity subject to a ten-count federal indictment for racketeering and his purported lack of knowledge of violations at his present place of employment and determined that Hurd is qualified to accept the appointment as manager for Oznemoc.
The Commission’s decision on this issue has substantial support in the record. Though it is not disputed that Hurd was the general manager of the Dollhouse in Pompano Beach, no evidence was offered to establish that Hurd was personally connected to the alleged unlawful conduct. Hurd was not indicted or even questioned in connection with the investigation of the charges. As to the suggestion that Hurd was unfit because he professed a lack of knowledge of any violations at the club where he was then employed, the Commission properly rejected it as a basis for disqualifying Hurd. There was no showing that Hurd disclaimed known violations. The existence of any violations was pure speculation. Without some specific articulable basis for implicating Hurd personally in some wrongdoing in the course of his duties as a manager of a licensed establishment, the Commission correctly determined that Hurd is qualified to accept an appointment as Oznemoc’s manager. This finding will be affirmed.
7. The Change of Name to Centerfolds
The Commission allowed Oznemoc’s petition to change the name of the club from the “Naked I” to “Centerfolds,” concluding that because it had no issues with Deyesso, “[i]t follows then that there is no issue with the use of a business name used elsewhere by Deyesso. As long as there is compliance with all laws of the Commonwealth, the ‘opposition’ of the Local Board has no basis in fact. Any denial or disapproval of the business name is, therefore, disapproved.” The Board does not press its challenge to the Commission’s decision other than to cite the issue in its brief. Therefore, the Commission’s decision to allow the petition for a change of name from “Naked I” to “Centerfolds” will not be disturbed.
CONCLUSION
Upon review of the record, this Court is satisfied that the Commission’s Decision is supported by substantial evidence and free of errors of law. The plaintiffs have failed to establish any ground upon which to invalidate the decision to approve Oznemoc’s petitions for (1) a transfer of 10% of Oznemoc stock to Deyesso; (2) adoption of a new management agreement; (3) a change in the designated manager; and (4) a change in name of the business. For these reasons, the Commission’s Decision is AFFIRMED.
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs’ Motions for Judgment on the Pleadings are DENIED. A judgment shall enter dismissing the complaints.

The Task Force is a charitable organization organized under Massachusetts law. It is a sub-committee of the Chinatown Neighborhood Council.

Pastor Thomas Lee of the Boston Chinese Evangelical Church, Father Regan of the St. James Church, Ruth Moy, Executive Director of the Greater Boston Chinese Golden Age Center and Peggy Engs, Co-Chair of the Task Force all testified before the Board.

Maiy Soo Hoo, Neil Chin, Joseph Wong and Claire Crow, all of whom are long-time residents of Chinatown, testified in opposition to the petitions.

Congressman Stephen Lynch, Representative Sal DiMasi, and Boston City Councillors Paul Scapicchio, Stephen Murphy, Mickey Roache, Peggy Davis-Mullen opposed the petitions through testimony from their designated representatives.

Representatives of the Boston Police Department testified in opposition to the petitions.

The Board did not consider the petition for the name change from “The Naked I” to “Centerfolds.” By agreement of the parties, that petition was submitted to the Commission.

Plaintiffs focus their challenge on the assertion that the Commission improperly rejected the Board’s findings and conclusions. However, this focus is misplaced. “The ABCC is required to offer a de novo hearing, that is to hear evidence and find the facts afresh." Dolphino Corp. v. Alcoholic Beverages Control Comm'n., 29 Mass.App.Ct. 954, 955 (1990). The task for this Court, therefore, is to assess the merits of the Commission’s decision rather than the Board’s decision.

The statute provides as follows: “Any license under this chapter held by an individual, partnership or corporation may be transferred to any individual, partnership or corporation qualified to receive such a license in the first instance, if, in the opinion of the licensing authorities, such transfer is in the public interest" (Emphasis supplied.)

The Commission correctly determined that Deyesso’s 10% share in Oznemoc combined with his 50% interest in Advisors did not amount to control inasmuch as Horowitz retained his 90% interest.

The statute provides in relevant part as follows: “Any license under this chapter held by an individual, partnership or corporation may be transferred to any individual, partnership or corporation qualified to receive such a license in the first instance, if, in the opinion of the licensing authorities, such transfer is in the public interest.” (Emphasis supplied.)

 Plaintiffs also point out that the character inquiry is mandated by G.L.c. 138, §26 which limits the issuance of a license to a licensee who has designated a manager whose character is “satisfactory to the licensing authorities.” This statute applies to Deyesso insofar as he is a principal of Advisors, a party to the Agreement.

Conviction for carrying unreported currency into the United States.

These allegations related to the witness’ claim that Deyesso obtained a valet license for his restaurant under false pretenses. Apparently Deyesso represented to the Board that he had attended a community meeting to discuss the issue when he knew that he had not attended the meeting.